Wilfredo Marquez COLON et al., Plaintiffs,

v.

James CARTER, President of the United States of America et al., Defendants.

Jorge COLON et al., Plaintiffs,

v.

James CARTER, President of the United States of America et al., Defendants.

COMMONWEALTH OF PUERTO RICO, Plaintiffs,

v.

Edmund S. MUSKIE et al., Defendants.

Civ. A. Nos. 80–2104, 80–2106 and 80–2117.

United States District Court, D. Puerto Rico.

Opinion and Order—Oct. 8, 1980.

On Motion for Reconsideration— Oct. 10, 1980.

See also, D.C., 507 F.Supp. 1035.

Michael J. Henke, Vinson & Elkins, Washington, D. C., Gerardo A. Carlo, San Juan, P. R., Néstor D. Ramírez-Cuebas, Dept. of Justice, Commonwealth of Puerto Rico, San Juan, P. R., for Commonwealth of Puerto Rico.

Pedro J. Saade Llorens, Río Piedras, P. R., for plaintiffs Jorge Colón, et al.

Pedro J. Varela, Hato Rey, P. R., for plaintiffs Máquez Colón, et al.

Luis R. Dávila Colón, Dept. of State, Commonwealth of Puerto Rico, San Juan, P. R., for Commonwealth of Puerto Rico.

José E. Colón Santana, Josefina Pantoja, A. Santiago, Río Piedras, P. R., Fausto D. Godreau, Servicios Legales de Puerto Rico, Juana Diaz, P. R., for plaintiffs.

William Want and Dorothy Burakreis, U. S. Dept. of Justice, General Litigations Section, Sand Division, Washington, D. C., for defendants.

## OPINION AND ORDER

TORRUELLA, District Judge.

The above-entitled consolidated cases arise from the decision made by executive governmental authorities to transfer to Fort Allen, Puerto Rico a number of undocumented Haitian and Cuban aliens that are presently being housed in refugee centers located in the State of Florida. Plaintiffs herein are the Commonwealth of Puerto Rico as well as several individual residents of the Municipality of Juana Diaz, Puerto Rico. Defendants are the President of the United States, James Carter, Secretary of State, Edmund S. Muskie; Secretary of Defense, Harold Brown; Secretary of Justice, Benjamin Civiletti; Rear Admiral Arthur Knoizen, Commander of the Caribbean Naval Forces of the United States; David W. Crossland, Director of the Immigration and Naturalization Service; Clifford Alexander, Jr., John W. Macy, Jr., Director of the Federal Emergency Management Agency ("FEMA"), and their agents, employees and successors in office.

This Court has jurisdiction over this controversy by reason of the federal questions presented and pursuant to 28 U.S.C. Sec. 1331.

Plaintiffs allege in essence that the intended transfer to Fort Allen of undocumented Cuban and Haitian aliens will be carried out in violation of the Constitution of the United States, of several Federal Laws including the National Environmental Policy Act ("NEPA"), 42 U.S.C. Sec. 4321 et seq., the Federal Water Pollution Control Act, 33 U.S.C. Sec. 1251 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Sec. 6901 et seq., the Water Pollution Control Act, 33 U.S.C. Sec. 1256,

and the Disaster Relief Act of 1974, 42 U.S.C. Sec. 5121, et seq.; of various Commonwealth Laws and the applicable Federal and local Regulations. More specifically, Plaintiffs allege that Defendants have failed to prepare an adequate and detailed environmental impact statement ("EIS") with respect to said transfer and related operations and activities, as required by Section 102(C) of NEPA, 42 U.S.C. Sec. 4332(C). The substance of Defendants' defense is based on the issuance of two Executive Orders which allegedly exempt Defendants from compliance with the variously cited environmental statutes.

The cases are now before us upon Plaintiffs' request for a temporary restraining order and Defendants' opposition thereto.

A hearing on the matter having been held at which the parties offered evidence and argued on behalf of their respective positions, the Court hereby makes the following

## FINDINGS OF FACT

1. On May 6, 1980 President Carter issued a declaration of emergency for the State of Florida. The declaration was made in a letter addressed to Mr. John W. Macy, Jr., Director of FEMA, and was based on the provisions of the Disaster Relief Act of 1974 ("Relief Act"), P.L. 93–288, 88 Stat. 143, 42 U.S.C. Sec. 5121 et seq. It reads in its pertinent parts as follows:

"I have determined that the impact on state and local government in Florida due to the arrival of large numbers of undocumented aliens beginning on or about April 13, 1980, is of sufficient severity and magnitude to warrant a declaration of emergency under Public Law 93–288. I therefore declare that such an emergency exists in the State of Florida. Further, the humanitarian aspects of this exodus from Cuba cannot be ignored.

"In order to provide appropriate federal assistance, you are authorized under Public Law 93–288 to take those measures which are necessary to assist state and local governments to control this unusual event and alleviate hardships or damage to individuals and public bodies. You are authorized further to allocate funds available for these purposes in such amounts as you find necessary for administrative expenses."

2. Subsequent to said declaration, the Cuban-Haitian Task Force was formed and staffed by various agencies of the Federal Government. This executive *ad hoc* group has over-all supervision of all efforts directed at resolving the problems created by the influx of the aliens, including the day-to-day operation of processing and resettlement centers and the coordination of efforts to resettle the refugees.

3. Throughout the summer of 1980 the flow of Cubans and Haitians into Florida continued. Pending resettlement, they were temporarily housed in various processing centers. Among those centers are two designated as Krome North Refugee Camp and Krome South Refugee Camp, located in Dade County, Florida.

4. The conditions in these camps, because of apparent physical deficiencies, became a serious health and sanitation hazard. As a result of this, on September 8, 1980, the Department of Health and Rehabilitation Services of the State of Florida issued legal notices of violations of the Florida Statutes and Sanitary Code against the operation of both the Krome North and Krome South Camps. Krome North was cited for 14 violations and corrective actions, and Krome South was cited for 19 violations and corrective actions. The violations ranged in nature, from improper sewage treatment and overcrowding to failure to provide soap and towels in sanitary facilities.

5. As an immediate consequence of this situation, a search for alternative locations ensued. Various federal departments and agencies participated in the efforts made to find alternative facilities. Although an inventory of available Department of Defense facilities (referred to in the memoranda as "Prospective Alternative Consolidation Sites") showed no less than 36 such sites in Continental United States, ranging in acre-

age from the low hundreds to the high hundred thousands, in mid-September the search inexplicably zeroed in on two Federal properties located in Puerto Rico, none of which were on the original inventory of available facilities. These two locations were Ramey Field, a former Strategic Air Command Base in Aguadilla, which was closed and turned over to various Commonwealth agencies (with the exception of a United States Coast Guard Compound), and Fort Allen in Juana Diaz, a United States Naval Communication Center in its last stages of dismantling before transfer to the Puerto Rico National Guard. On September 23, 1980 the Federal Government decided upon Fort Allen.

6. Fort Allen occupies a low-lying area of approximately 940 acres. It is located in the Southern part of Puerto Rico, where it abuts several wards of Juana Diaz, a Municipality of Puerto Rico, and is near the town of Juana Diaz. The base is surrounded by a fence and contains various barracks, administrative and recreational buildings, as well as complementary support facilities consistent with a base whose population here never exceeded 1,500 persons (its usual number ranged in the vicinity of 500 to 800).

7. The evidence presented is conflicting as to the number of refugees to be transferred to Fort Allen. The numbers vary from between 5,000 to 20,000 in the figures that appear in the early documentation, to 1,000 to 3,000 in the present-day versions. The Court tends to conclude that the lower figures are presently contemplated, at least initially, although we note that the capacity of the camp under construction is designed to hold 5,000 refugees. We also note in this respect, that although the Government's representative at the hearing indicated that only the Krome inmates, whose present population consists of 652 Haitians and 262 Cubans, are to be transferred to Fort Allen, it was also indicated that all future new entrants will also be transferred to the new site. Since entries from Haiti appear to be continuing on a daily basis, it appears that the Fort Allen population will continue to expand if the present plans are executed.

The Government intends to commence the transfers from Florida on October 14, 1980.

8. The Fort Allen processing center is composed at present of the former existing facilities, which will house approximately 1,000 security and support personnel, and the refugee facilities presently under construction, approximately half of which have been completed. The refugee facilities consist of 14 compounds surrounded by chain link fence topped by barbed wire. Within each compound will be built twelve living tents, framed with wood and covered by canvas. Each tent will house up to 30 refugees. Various administrative, sanitary, and recreational tents will also be constructed in each compound. The Haitian and Cuban refugees will be segregated from one another, and separate housing for single males and females will also be provided. A separate compound will also house the problem or Level II, inmates. At some future date diverse sports facilities are planned to be constructed. Present plans call for the staffing and care of the medical needs of the refugees by the use of existing and reconditioned facilities at Fort Allen, supplemented by those of Roosevelt Roads Naval Station in Ceiba, Puerto Rico.

9. The existing water treatment facilities at Fort Allen can handle a maximum population of 1,500 persons and an effluent volume of 172,000 gallons during any consecutive 30-day period. The impact of the expected total population at Fort Allen, even in the immediate future, will greatly exceed these parameters and constitutes a clear and present danger to the health of the prospective residents of the Fort Allen refugee camp, as well as to the general public in its vicinity.

10. October is a hurricane month in Puerto Rico. The proposed refugee housing at Fort Allen is totally inadequate to meet such a condition. No acceptable contingency plan has been prepared or is available for the care and provision of the inmates during and/or after such a catastrophe. October is also the month with the second highest level of precipitation in Puerto Rico, and

in particular the South Coast. The Fort Allen area is subject to flooding, as evidenced by various emergency declarations in the past (the most recent of which was in September, 1979). It is also an area infested with the *anopheles punctipennis* mosquito, the carrier of malaria. Although malaria has not been reported in Puerto Rico since 1954 (with the exception of some Viet Nam-generated cases and some reported in preachers returning from Haiti) the above mentioned factors, when considered with the fact that none of the refugee tents will be provided with mosquito netting or screens, and that a large proportion of the camp's occupants will be proceeding from Haiti, a country wherein malaria is endemic, are the potential source of serious public health problems and present a clear and present danger of the same.

11. The nature of the refugee-related activities to be conducted at Fort Allen, when considered in the light of incarceration-type confinement, under the physical conditions expected at Fort Allen, and, particularly as applied to the Creole-speaking Haitians, in a relatively hostile environment, are the potential source of a serious public order problem. The non-speculative nature of this conclusion is borne out by the notorious incidents which have already taken place in other refugees camps, under considerably less restraints than the inmates will be subjected to in Fort Allen.

12. The United States has already spent, or has committed to spend, in the vicinity of $10,000,000 in connection with the construction and operation of the refugee camp at Fort Allen, as well as has used and will use, considerable manpower and equipment to effectuate these goals.

13. Defendants have not filed an environmental impact statement with respect to the activities which are being carried out, and are about to be carried out, at Fort Allen.

14. The over-all use of Fort Allen for the intended purpose of a refugee camp, under the present circumstances, poses a serious potential health and environmental hazard to the refugees and to the adjacent communities. It also presents a high risk of disturbance to the public peace, with consequent possible threats of injury to persons and property.

15. On October 3, 1980 President Carter issued an Executive Order determining that it was in the paramount interest of the United States to exempt Fort Allen from the requirements imposed by several environmental statutes. He therefore exempted Fort Allen from compliance with the provisions of the Federal Water Pollution Control Act, as amended, 33 U.S.C. Sec. 1251 et seq., of the Clean Air Act, as amended, 42 U.S.C. Sec. 7401 et seq., of the Noise Control Act of 1972, as amended, 42 U.S.C. Sec. 4901 et seq., and of the Solid Waste Disposal Act, as amended, 42 U.S.C. Sec. 6901 et seq. These exemptions are subject to the exceptions stated in the Executive Order. The exemptions were granted for a period of one year beginning on October 2, 1980 and ending on October 1, 1981.

## CONCLUSIONS OF LAW

1. Individual Plaintiffs have standing to bring this action because they allege actual or threatened injury to themselves. *Warth v. Selding*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Puerto Rico has standing by virtue of an alleged injury to the natural resources of this Commonwealth and in the capacity of *parens patriae* of the health and welfare of its People. *Commonwealth of Puerto Rico v. S.S. ZOE COLOCOTRONI*, 456 F.Supp. 1327, 1337 (D.C.P.R., 1978), reversed in part, 628 F.2d 652 at pages 671–672 (C.A. 1, 1980); see also 2 L.P.R.A. 112, et seq.

2. Section 102 of the National Environmental Policy Act of 1962 ("NEPA"), 42 U.S.C. § 4332, in its pertinent part, reads as follows:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2)

all agencies of the Federal Government shall—

.    .    .    .    .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved.  Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

.    .    .    .    .

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

3.  The actions of the United States, as executed and/or as about to be executed through Defendants and their agents constitute "major Federal actions" within the meaning of Section 102(2)(C) of NEPA, whose conditions must be complied with prior to the taking of such action.  *Barceló v. Brown*, 478 F.Supp. 646, 703–704 (D.C. P.R., 1979), on appeal.

4.  Defendants are in non-compliance with Section 102(2)(C) of NEPA.

5.  Section 405 of the Federal Disaster Assistance Act, 42 U.S.C. § 5175 reads as follows:

"No action taken or assistance provided pursuant to section 5145, 5146, or 5173 of this title, or any assistance provided pursuant to section 5172 or 5189 of this title that has the effect of restoring facilities substantially as they existed prior to the disaster, shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.  Nothing in this section shall alter or affect the applicability of the National Environmental Policy Act of 1969 to other Federal actions taken under this chapter or under any other provision of law."

Defendants argue that President Carter's declaration of emergency of May 6, 1980 triggers the application of Section 405 to the present situation and thus makes inapplicable the provisions of Section 102(2)(C) of NEPA.

█ Although a Presidential declaration of emergency is entitled to great deference by the Courts, it is subject to revision under appropriate circumstances.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1951).  This is such a circumstance.  Cf. *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

From its context, it is clear that the President is attempting to invoke an "emergency" pursuant to the specific terms of the Disaster Relief Act (P.L. 93–288).  Section 102(1) (42 U.S.C. § 5122(1) of this statute reads as follows:

" 'Emergency' means any hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, tsunami, earth-

quake, volcanic eruption, landslide, mudslide, snowstorm, drought, fire, explosion, or other catastrophe in any part of the United States which requires Federal emergency assistance to supplement State and local efforts to save lives and protect property, public health and safety or to avert or lessen the threat of a disaster."

■ We are constrained to hold that the plain language of this definition does not support the application of that statute to the refugee situation in Florida. Nowhere does this statute refer to other than natural disasters. The term "catastrophe", the only word that could be stretched to cover the refugee situation, must be read *in pari materia* with the other terms of the statute, which all refer to natural disasters. The Legislative history further supports this contention as it speaks of *natural* disasters. H.R.No.2141, reprinted at 1966 U.S.Code Cong. & Admin.News, pp. 4135, 4136: We should add that even if we take the word "catastrophe" out of the context of the statute in question, it denotes "an unusual, extraordinary, sudden and unexpected manifestation of the forces of nature which cannot be prevented by human care, skill or foresight" (see *Rohr v. Logan*, 206 Pa.Super. 232, 213 A.2d 166, 169 (1965)), circumstances which are hardly applicable herein. See also Webster's Third New International Dictionary, page 351 (1971); 14 C.J.S. Catastrophe p. 34 (Supp., p. 7).

Furthermore, the terms of the Presidential declaration, which considering the strong policy determinations expressed by Congress in NEPA, must be restrictively interpreted, are only applicable, again by the plain language of the declaration, to the *State of Florida* and not to Puerto Rico where no "emergency", statutory or otherwise, exists as to refugees.

Thus the exemption to NEPA provided by 42 U.S.C. § 5175 is inapplicable to the present controversy.

■ 16. The Executive Order of October 3, 1980 is a valid exercise of Presidential Powers notwithstanding its invocation by a party Defendant after the commencement of this litigation.

This Court is not unmindful or callous to the plight of the refugees in question. But the issue is not whether these unfortunate people will be denied or granted succor. They have *de facto* if not *de jure* already been granted asylum by the United States. Furthermore, this Court takes notice of the fact that the People of Puerto Rico, notwithstanding the highly overcrowded conditions of this Island and the lack of resources to attend to their own basic needs, have already accepted within their midst many thousands of refugees. That is thus not the issue.

The real issue before this Court is whether the Federal Government can cure violations of law in Florida, by engaging in similar action in Puerto Rico.

The answer to this question is self-evident.

17. The proof adduced in this case establishes that Plaintiffs will suffer irreparable harm from Defendants' actions and from the denial of a preliminary injunction. Furthermore, there is clearly, particularly in this case, the absence of any adequate remedy at law or otherwise. The balancing of the equities, or the relative inconvenience to the parties, also does not favor Defendants. Lastly, there is substantial likelihood that Plaintiffs will prevail on the merits of this case although we express no opinion at this time regarding various other claims by Plaintiffs. It is therefore our opinion that the requisites for the issuance of preliminary injunctive relief have been met. See *Betteroads Asphalt Corp. v. Federación de Camioneros*, 391 F.Supp. 1035, 1039 (D.C.P.R., 1975); *Pauls v. Secretary of Air Force*, 457 F.2d 294 (C.A. 1, 1972).

IT is therefore ORDERED that:

1. Plaintiffs' Motion for Preliminary relief is granted,

2. Defendants, their agents, employees and all persons acting in concert or participation with them shall forthwith cease and desist, and are hereby enjoined, from taking any further action, of all natures, for the

purpose of transferring refugees to Fort Allen, Puerto Rico, until such time as 42 U.S.C. § 4332(2)(C) has been complied with, or until such time as this Order has otherwise been duly modified.

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

This Court is asked to rule in haste upon matters of far-reaching impact and consequence. To an extent this is justified by the nature of this controversy and the need of the parties to receive the Court's guidance in their future actions. But the old saying that "haste makes waste" has as much application to this proceeding as to other courses of human endeavor. This is particularly so when we consider that the "waste" in question may well be the rights of persons and parties, who until this very morning, were entitled to the protection of this Court.

We are not unmindful of the powers of Congress and of the Executive Branch of Government, and of the principles under our Constitution that require Courts to give due deference to decisions rightfully within the constitutional spheres of those Branches of Government. But Courts of Justice, particularly when sitting in equity, if they are to do honor to their name, are duty-bound also to protect the viability of the controversies before them and to prevent the mooting of the rights of the parties before them. *Providence Journal v. Federal Bureau of Investigation*, 595 F.2d 889 (CA 1, 1979). Particularly under the present circumstances, which raise several issues of first impression, wherein Plaintiffs have claimed serious and substantial legal questions, and in which Defendants have answered in a vague and conflicting manner important factual questions, it is incumbent upon us to maintain the status quo as to those activities covered by our preliminary injunction which might otherwise be mooted until those rights and pertinent facts can be further clarified. To do otherwise will render this case academic.

In this respect we must consider the new legislation[1] and the new executive order[2] separately.

We do not harbor the same doubts as to the validity of the new legislation which we have regarding the decision to transfer the refugees to Fort Allen. We thus cannot continue our injunction as applied to the requirements of compliance with 42 U.S.C. § 4332(2)(c). More specifically our order is lifted as applied to any new construction in Fort Allen pursuant to the new legislation.

The decision to transfer the refugees, however, stands on a different footing. Although it is presumed, because of the timing of the enactment vis-a-vis the issuance of the preliminary injunction, that Congress was unaware of the specific findings of fact of this Court, or in any event, that Congress was not legislating specifically for the Fort Allen situation, these presumptions are not available to President Carter, who is a party defendant in this case. Considering the specific findings of this Court regarding the probable health hazards to the refugees and nearby residents of Fort Allen that may be caused by the present transfer of the refugees to that location, and taking into account that other sites are available to safely house these refugees, the issuance this morning of an executive order convalidating such a transfer, is reviewable by this Court pursuant to 5 U.S.C. § 706(2)(A), with a high probability of Plaintiffs' success when the case is heard on the merits. See *Citizens to Preserve Overtone Parks v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Lastly, the very fact that Defendants have alternative sites available, allows the status quo at Fort Allen to be maintained as regards the health hazards to the refugees and nearby residents, without mooting of the case.

Wherefore, the preliminary injunction issued on October 8, 1980 is set aside except in its application to the transfer of refugees to Fort Allen, Puerto Rico.

---

1. See Appendix A.

2. See Appendix B.

# 1034

The parties are ordered to forthwith commence and complete all necessary discovery within the next 30 days and this matter is set for further hearing on November 20, 1980 at 9:00 A.M., for the purpose of taking such additional evidence as is necessary to determine the factual issues raised by this controversy. The parties are further ordered to appear before the United States Magistrate on October 14, 1980 at 9:00 A.M. for the purpose of setting a strict compliance timetable of discovery within the 30-day period indicated, and the conducting of a pre-trial conference before the date of the hearing.

IT IS SO ORDERED.

## APPENDIX A

### H.R. 7859—11

### TITLE V—OTHER PROVISIONS RELATING TO CUBAN AND HAITIAN ENTRANTS

#### Authorities for other programs and activities

Sec. 501.(a)(1) The President shall exercise authorities with respect to Cuban and Haitian entrants which are identical to the authorities which are exercised under chapter 2 of title IV of the Immigration and Nationality Act. The authorizations provided in section 414 of that Act shall be available to carry out this section without regard to the dollar limitation contained in section 414(a)(2).

(2) Any reference in chapter III of title I of the Supplemental Appropriations and Rescission Act, 1980, to section 405(c)(2) of the International Security and Development Assistance Act of 1980 or to the International Security Act of 1980 shall be construed to be a reference to paragraph (1) of this subsection.

(b) In addition, the President may, by regulation, provide that benefits granted under any law of the United States (other than the Immigration and Nationality Act) with respect to individuals admitted to the United States under section 207(c) of the Immigration and Nationality Act shall be granted in the same manner and to the same extent with respect to Cuban and Haitian entrants.

(c)(1)(A) Any Federal agency may, under the direction of the President, provide assistance (in the form of materials, supplies, equipment, work, services, facilities, or otherwise) for the processing, care, maintenance, security, transportation, and initial reception and placement in the United States of Cuban and Haitian entrants. Such assistance shall be provided on such terms and conditions as the President may determine.

(B) Funds available to carry out this subsection shall be used to reimburse State and local governments for expenses which they incur for the purposes described in subparagraph (A). Such funds may be used to reimburse Federal agencies for assistance which they provide under subparagraph (A).

(2) The President may direct the head of any Federal agency to detail personnel of that agency, on either a reimbursable or nonreimbursable basis, for temporary duty with any Federal agency directed to provide supervision and management for purposes of this subsection.

(3) The furnishing of assistance or other exercise of functions under this subsection shall not be considered a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

(4) Funds to carry out this subsection may be available until expended.

## APPENDIX B

### EXECUTIVE ORDER

#### CUBAN AND HAITIAN ENTRANTS

By the authority vested in me as President of the United States of America by Section 501 of the Refugee Education Assistance Act of 1980 and Section 301 of Title 3 of the United States Code, and in order to provide for assistance to be made available

relating to Cuban and Haitian entrants, it is hereby ordered as follows:

1–101. All the functions vested in the President by Section 501(c) of the Refugee Education Assistance Act of 1980, are hereby delegated to the Secretary of State.

1–102. In carrying out the functions delegated to him by this Order, the Secretary of State shall ensure that among the actions he takes or directs from time to time, he shall promptly take action which provides assistance for those Cuban and Haitian entrants located or to be located at Fort Indiantown Gap, Fort McCoy, Fort Chaffee, Fort Allen, existing processing and reception sites in Florida, and such other sites as he may designate.

THE WHITE HOUSE,