# Use of the Disaster Relief Act of 1974 in an "Immigration Emergency"

The Disaster Relief Act authorizes the provision of federal aid to state and local governments in the event of an emergency or major disaster, whether resulting from natural or man-made causes. Whether a particular "immigration emergency" so threatens property or human life as to fall within the scope of the Act is a matter for the President in his discretion to determine.

November 19, 1982

## MEMORANDUM OPINION FOR
## THE ASSOCIATE ATTORNEY GENERAL

This responds to your inquiry whether it would be appropriate for the President to use the Disaster Relief Act, 42 U.S.C. §§ 5121–5202 (1982) (Act), in a situation comparable to the recent Cuban boatlift or other similar "immigration emergency." The legal question raised is whether such an "immigration emergency" would constitute either an emergency[1] or a major disaster[2] under the Act. We have concluded that the Act covers emergencies arising from both man-made and natural disasters. We have also concluded that whether a particular situation—such as an "immigration emergency"—falls within the scope of the Act is a matter for the President to determine—a determination that has been placed wholly within the President's discretion. 42 U.S.C. § 5122(2). We believe that the Act was meant to encompass catastrophic events—either impending or actual—that threaten property and the lives of people. In the absence of specific facts, we are unable to say with certainty whether a particular "immigration emergency" would constitute such a catastrophic event. Similarly, we are unable

---

[1] The Act defines an emergency as

> any hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, drought, fire, explosion, or other catastrophe in any part of the United States which requires Federal emergency assistance to supplement State and local efforts to save lives and protect property, public health and safety or to avert or lessen the threat of a disaster

42 U.S.C § 5122(1) (1982)

[2] A "major disaster" is any of the events listed in the definition of "emergency," *supra*, n 1,

> which, in the determination of the President, causes damage of sufficient severity and magnitude to warrant major disaster assistance under this chapter, above and beyond emergency services by the Federal Government, to supplement the efforts and available resources of States, local governments, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby.

42 U.S.C. § 5122(2) (1982)

to say that the Act could never apply. Rather, we will outline what we believe to be the touchstones of an emergency under the Act.

## I. The Disaster Relief Act

The Act is the most recent version of legislation that was first enacted in 1950. Disaster Relief Act of 1950, Pub. L. No. 81–875, 64 Stat. 1109 (1950). A major disaster was originally defined by a somewhat shorter list,[3] but the central purpose—to create a coherent framework for dealing with the unexpected—was, from the beginning, expressed clearly:

> The purpose of the bill is to provide for an orderly and continuing method of rendering assistance to the States and local governments in alleviating suffering and damage resulting from a major peacetime disaster and in restoring public facilities and in supplementing whatever aid the States or local governments can render themselves.

S. Rep. No. 2571, 81st Cong., 2d Sess. 1 (1950).[4]

The 1950 legislation was intended to create permanent legislation to deal with what had, to that point, been covered in an *ad hoc,* haphazard manner:[5]

> For obvious reasons, it is not possible for the committee to approve legislation in each disaster in any particular area. Our committee would be overworked with legislation of that kind. The legislation that is before us today is the kind that will meet all emergencies of a disaster, and gives the President the necessary authority for not only providing the relief but for coordinating the relief.

96 Cong. Rec. 11902 (1950). The Act was drafted by Members of Congress who were willing to exchange the careful congressional evaluation of each event that had heretofore been involved for the quicker response that an emergency situation usually calls for, a response that the Executive, acting alone, can provide. From the beginning, Congress realized that the Act, because of this calculus, placed broad discretionary power in the hands of the President. Statements from

---

[3] The list of covered events included "floods, drought, fire, hurricane, earthquake, storm or other catastrophe." 42 U S C § 1855a(a) (1952).

[4] *See also* H.R Rep No 2727, 81st Cong., 2d Sess. 2 (1950), 96 Cong Rec. 11895–96, 11907 (1950).

[5] Rep Hagen inserted a list of 128 acts passed by Congress since 1803 to cover various disasters. 96 Cong. Rec 11900–02 (1950). It is not evident that this list was necessarily intended to identify the kinds of disasters the 1950 legislation was intended to cover. It is interesting to note that although Rep. Hagen referred to it as covering "sufferers from floods, fires, earthquakes and other natural disasters," 96 Cong Rec. 11899 (1950), the list in fact included statutes that covered man-made disasters. food for Florida residents driven from their homes by Indian depredations, 5 Stat. 131 (1836); monetary relief for survivors of an Indian massacre, 12 Stat 652 (1863); relief from import duties for charitable contributions sent to blacks "who may have emigrated from their homes to other States," 21 Stat. 66 (1880); money for the relief of destitute American citizens in Cuba, 30 Stat. 220 (1897); money for losses suffered by the crew of the U S.S Maine when it exploded, 30 Stat 346 (1898), and supplies for the relief of destitute Cubans who were suffering from the disruptions of war, 30 Stat. 419 (1898) *Id.* at 1069 (1899).

the 1950 debate reflect this recognition, including the awareness that, as with any grant of discretionary authority, there was a danger of abuse.

> When it comes to providing for human suffering, to provide for the protection of human life, we must give some discretion. I will risk the President of the United States and the governors of the States.

96 Cong. Rec. 11898 (1950) (statement of Rep. Whittington).[6]
The debate continued:

MR. KEATING: [I]t seems to me that the essential difference between the way we have been handling this and the way it is proposed to handle it under . . . this measure is that heretofore Congress has passed upon the need for the funds, but under this it is left entirely to the Executive to say whether the disaster threatens to be of sufficient severity and magnitude to warrant disaster assistance by the Federal Government.

MR. WHITTINGTON: . . . That is exactly what we had done.

96 Cong. Rec. 11910 (1950).

MR. ROBERTSON: Is it the Senator's interpretation that the bill would apply to whatever disaster the President might be pleased to have it apply?

MR. McCLELLAN: That is correct. . . .

However, I think we certainly can rely upon whoever may be President of the United States having some judgment, and also having some humanitarian feelings and applying such feelings in making a decision as to what is a major disaster, where people have suffered or are about to suffer, and where the Federal Government should step in and assist.

96 Cong. Rec. 15096, 15097 (1950).

We have not found anything in the subsequent amendments to this legislation indicating a desire to limit this discretion.

## II. Natural and Man-made Disasters

There has been some confusion over the years as to whether the phrase "or other catastrophe" includes events other than those usually thought of as

---

[6] Rep Whittington was Chairman of the House Committee on Public Works, which had drafted the bill

"natural," *i.e.*, hurricanes, earthquakes, and tornadoes.[7] We believe that the Federal Emergency Management Agency (FEMA) and its predecessors have administered the Act to cover man-made as well as natural events. Given the many years of congressional acquiescence in this administration of the Act, this administrative interpretation would normally, without more, be regarded as authoritative and correct.

When the 1950 legislation was being debated, most references were to what are generally considered "natural" disasters. But reference was made to a nuclear disaster. Referring to the $5,000,000 appropriation made under the bill, Rep. Keating said:

> [A]s the gentleman from Wisconsin said, $5,000,000 is just a starter. If a major disaster struck this Nation, such as an atomic explosion or something of that kind, the Congress of the United States would be the first on the spot to alleviate any suffering in such a situation as that.

96 Cong. Rec. 11911 (1950).

It is true that when the Act was under consideration in 1974, its sponsors referred to the "natural" hazards that will be covered.[8] But there was also reference, albeit ambiguous, to the definition as covering "any one of a number of natural hazards *or other catastrophes* causing damage that requires emergency assistance." 120 Cong. Rec. 4169 (1974) (statement of Sen. Burdick, floor manager) (emphasis added). Extensive hearings were held,[9] but they were held in towns that had suffered from the most recent disasters—Hurricanes Camille and Agnes, and the Rapid City, South Dakota flood—all of which happened to be natural, and the testimony received focused on the aid needed, not on the disasters' causes.[10]

In order to clarify whether the Act can properly be used to cover man-made disasters, an issue that is apparently now disputed by FEMA,[11] we have examined the administrative practice under the Act and its predecessors. It is apparent from the list provided to us by FEMA of all the emergencies that have been covered since May 1, 1953, by the Act or its predecessors, that man-made disasters have been covered for as long as there has been specific disaster legislation. A survey of the list shows that the President has declared a disaster to cover the presence of

---

[7] This Office once examined the issue in terms of "natural" *versus* man-made disasters and concluded that the damage caused by the riots of the late 1960s was not covered by the Act. Memorandum for David Ginsberg, Executive Director, National Advisory Commission on Civil Disorders, from Warren Christopher, Deputy Attorney General, Nov. 22, 1967. Our files contain an unsigned memorandum, however, dated Aug. 16, 1965, that arrives at the opposite conclusion.

[8] *See, e g ,* 120 Cong Rec. 4162, 4165, 4166 (1974) (statement of Sen. Burdick)

[9] *To Investigate the Adequacy and Effectiveness of Federal Disaster Relief Legislation. Hearings Before the Subcomm. on Disaster Relief of the Senate Comm on Public Works, Pts 1–6,* 93rd Cong , 1st and 2d Sess. (1973–1974)

[10] The same is true of the hearings held in 1950. *See Disaster Relief. Hearing on S. 2415 Before the Subcomm. of the Senate Comm on Public Works,* 81st Cong., 2d Sess (1950), and *infra,* n 23

[11] *Compare* Letter to Ms Renee L Szybala, Special Assistant to the Associate Attorney General, from George W Jett, General Counsel, FEMA, Aug. 2, 1982, *with* Memorandum for Robert Bedell, Office of Management and Budget, from George W. Jett, General Counsel, FEMA, May 3, 1980.

a sunken barge in the Mississippi River because of its cargo of 2,200,000 pounds of liquid chlorine;[12] a massive power failure in Alaska;[13] the presence of chemical wastes in the soil underlying a residential area;[14] explosions in the sewer system of Louisville, Kentucky because of illegal chemical dumping;[15] dam collapses due solely to engineering failures;[16] fires due to arson;[17] and the sudden influx of approximately 250,000 illegal aliens from Cuba. 16 Weekly Comp. 868 (1980). There is no indication in the legislative history of the Act or any of its predecessors that Congress intended the President to distinguish between floods caused by rivers swollen by melting snow, floods caused by the collapse of dams eroded by heavy rains, *see* 9 Weekly Comp. 657 (1973), and floods caused by the collapse of mechanically flawed dams, *see* note 16 *supra*. Nor is there any indication that the Executive was to spend valuable time distinguishing—if it were possible—between, for example, brush fires started by arsonists and those started by lightning. Rather, revisions to the Act have focused on improving the delivery of aid, and increasing the kinds that are available. Unless we are willing to read "naturally occurring" into the statute as a modifier to "fire" and "explosion," we cannot read it in to modify "catastrophe."

We would note that the Act has been amended five times since 1950,[18] and that each time the President and his aides have been criticized for various delays in providing aid. Each time there have been calls for more, not less, aid, and quicker response times.[19] We have not been able to find suggestions that the President delay the delivery of aid while the exact cause of the disaster is unearthed. The whole point of the Act is to provide assistance to those in need as soon as possible and to leave the careful sifting of cause and effect by time-consuming investigations to the future.[20]

---

[12] The emergency was declared on October 6, 1962 *United States* v *Cargill*, 367 F.2d 971 (5th Cir 1966), *aff'd sub nom. Wyandotte Transportation Co* v *United States*, 389 U S. 191 (1967). The United States successfully raised the barge and sued to recover the $3,081,000 cost, much of which was for measures taken to alert the public to potential risks and to protect them in case the chlorine tanks ruptured *See also* N Y. Times, October 11, 1962, at 24, col. 2, *id.*, November 6, 1962 at 12, col. 5.

[13] 10 Weekly Comp. 1149 (1974) The federal government provided supplementary generators until power could be restored

[14] 16 Weekly Comp 967 (1980) (Love Canal).

[15] 17 Weekly Comp. 333 (1981) The explosions were later found to be the responsibility of a company whose soybean mill leaked a highly explosive industrial solvent into the sewers.

[16] 12 Weekly Comp 1036–37, 1049 (1976) (Grand Teton Dam).

[17] 17 Weekly Comp 1351 (1981) (Massachusetts fire set by arsonist that caused $40 million in damage); 16 Weekly Comp. 2780 (1980) (California brush fire started by illegal campfire that caused $25 million in damage)

[18] Although the law was amended in 1962 to cover the territories, Pub L No 87–502, 76 Stat 111 (1962), and in 1966, Pub. L. No 89–769, 80 Stat 1316 (1966), and 1969, Pub. L. No. 91–79, 83 Stat. 125 (1969), to increase the kinds of assistance available, it was not until 1970 that it was comprehensively amended. Pub L. No. 91–606, 84 Stat. 1744 (1970) The 1970 law reenacted the major provisions of the earlier laws, consolidating in one statute provisions that had been scattered throughout the Code, and added several new forms of aid. *See* 116 Cong. Rec. 31045 (1970) (statement of Sen. Bayh), S Rep 1157, 91st Cong., 2d Sess (1970). The definition of major disaster was specifically retained, *see* H.R Rep No. 1752, 91st Cong , 2d Sess 18 (1970); S. Rep No 1157, 91st Cong , 2d Sess 25 (1970), except for certain specific additions to the list: tornadoes, high water, wind-driven water and tidal waves. 42 U.S.C. § 4401 (1970) The 1974 Act, which contains the most recent amendments, had as its central purpose the same kind of consolidation and expansion. *See* H.R Rep No. 1037, 93rd Cong., 2d Sess (1974); S. Rep No 1778, 93rd Cong., 2d Sess (1974).

[19] *See, e.g* , 116 Cong Rec. 34795 (1970) (statement of Rep. Clausen) ("It is our intent to equip the executive branch, which we believe is now hampered, with the kind of authority to move in the direction of a definite action program to give immediate relief to the people who need it at the most possibly important time in their life ")

[20] Indeed, in some cases the cause will never be known, *i.e.*, experts may suspect that a fire was arson but find it impossible to prove.

Given this prior administrative practice, the breadth of the President's discretion as perceived by Congress, and the fact that Congress could have limited the statute to natural disasters,[21] we believe that the Act covers man-made as well as natural disasters.

## III. Immigration Emergencies

FEMA has taken the position that use of the Act for an immigration emergency is inappropriate for three reasons. While we do not, as indicated below, find any of these reasons persuasive, obviously the Act will not be available for every immigration emergency. Rather, we believe that the President may use the Act in any emergency, including an immigration emergency, if he finds that the damage, loss, hardship, or suffering is of the kind encompassed by the Act. As a guide, we detail below some of the indicia which may be relevant in determining when a crisis is an emergency covered by the Act.

FEMA advances three reasons why the Act is not available for immigration emergencies. First, as an indication of Congress' concern with the Act's use for man-made emergencies, it points to S. 2250, a bill which passed the Senate in June and has now been referred to the House Public Works Committee. S. 2250 would change the last phrase in 42 U.S.C. § 5122(2) to "or other *natural* catastrophe." S. 2250, § 5(1), 97th Cong., 2d Sess. (1982) (emphasis added). The accompanying report recognizes that the Act has been used to cover non-natural catastrophes. S. Rep. No. 459, 97th Cong., 2d Sess. 2 (1982), and that these uses have "provoked recent Congressional concern." *Id.* We would note that this amendment would only limit the declaration of a "major disaster," 42 U.S.C. § 5122(2), not the more limited declaration of an "emergency." *Id.* § 5122(1).

This proposed amendment is of minimal use in interpreting the statute as presently enacted. Congressional critics may take issue with particular non-natural emergencies the President has chosen to cover, but the Senate report itself recognizes the long history of the President's reliance on the Act to respond to non-natural emergencies. This would seem to undercut any argument that only natural emergencies may be covered. In fact, S. 2250's retention of a definition of "emergency" that is not limited to "natural" events would seem to indicate a continued desire that some federal aid remain available for man-made emergencies.

Second, FEMA indicates that Lee Thomas, Associate Director for State and Local Programs and Support, testified during his Senate confirmation hearings that he would only recommend coverage for an emergency if it were a natural disaster or one specifically mentioned in the Act. We have been asked a legal question about underlying authority to act, not the policy question about when FEMA will recommend that the President exercise his discretion to act. We defer

---

[21] *Compare* Wisc. Stat. § 49.19 (11)(b) (1975) (aid limited to "natural disaster"), discussed in *Kozinski* v. *Schmidt,* 436 F. Supp 201 (E.D. Wisc. 1977).

to Mr. Thomas on the latter question, but it is one that has no relevance to our discussion of the legal issues.

Finally, FEMA cites two cases decided by the district court in Puerto Rico which held that the Act was only intended to cover natural disasters. *Colon* v. *Carter,* 507 F. Supp. 1026, 1031–32 (D.P.R.), *vacated on other grounds,* 633 F.2d 964 (1st Cir. 1980); *Commonwealth of Puerto Rico* v. *Muskie,* 507 F. Supp. 1035, 1044–45 (D.P.R.), *vacated on other grounds,* 668 F.2d 611 (1st Cir. 1981). Even if both decisions had not been vacated by the First Circuit, with the court specifically noting that there was no need to reach the issue of whether the Act applied, *Colon, supra,* 633 F.2d at 966 n.3, we would remain unpersuaded. The district court assumed that all the events listed in the Act were "natural" disasters and did not consider that fires and explosions, for example, can be man-made. Nor did the district court address the longstanding administrative practice—a practice of which it may well have been unaware.[22]

We should note that in 1980, at the start of the Cuban boatlift, this Office was asked, on an expedited basis, to examine the Act's applicability. No formal opinion was issued but, despite some doubts as to its availability for man-made disasters, we did not interpose any objection to the use of the Act. We relied in part on FEMA's determination that the Act was available. *See* note 11, *supra.*

We believe that whether a disaster is triggered by human or natural agents is legally irrelevant. The issue for the President is whether it has caused "damage of sufficient severity and magnitude" to warrant additional federal assistance to alleviate "the damage, loss, hardship or suffering caused thereby." 42 U.S.C. § 5122(2). There is usually general agreement about what a disaster is—whether it comes in the form of a hurricane or as the imminent meltdown of a nuclear reactor—but in those cases in which there is some question, Congress has given the President guidance for determining the extent of his discretion. The most prominent of these is the request for aid by a state governor. "The basis which has always been applied is that the disaster must be of such major proportions that the governor of the State in which the disaster takes place feels that it is beyond the power of the State and of the local units of government to meet it adequately." 96 Cong. Rec. 15097 (1950) (statement of Sen. Holland). This requirement ensures that the chief executive of the affected area believes there is a severe problem that state and local resources are inadequate to handle. The President can then consider whether the emergency calls for the kind of aid made available under the Act. If an event calls for one or more of several forms of assistance, it seems likely that Congress intended the Act to cover it.[23] The President should,

---

[22] The district court states that the legislative history supports this interpretation but refers only to a House report issued during the 1966 amendments. *Colon, supra.* 507 F. Supp. at 1032. Since this Department appealed the district court's decision to the First Circuit, it is self-evident that neither this Department nor the Executive in any way acquiesced in the reading given the Act by the district court.

[23] Major disasters that may strike American communities can be of all kinds. No two disasters are alike in nature, scope of damage, or amounts of available State and local government resources.
  Consequently, the kind and amount of Federal aid required will vary in each case. In one case the principal Federal assistance may be medical aid; in another case, temporary housing, in another case, evacuation transportation, and so forth.

*Disaster Relief Hearings on H.R. 8396, H.R 8461, H.R. 8420, H.R. 8390, and H R. 8435 Before the House Comm. on Public Works,* 81st Cong., 2d Sess. 78–79 (1950) (statement of Elmer B. Staats, Assistant Director of the Bureau of the Budget).

therefore, in deciding whether an event is an emergency or a major disaster, examine the following statutory factors:

1. The need for immediate centralized coordination of federal agency relief efforts;[24]

2. The need for a central federal officer to coordinate with private relief organizations;[25]

3. The need to take immediate steps to safeguard lives and property; to perform essential community services; or to distribute food and medicine;[26]

4. The need to provide emergency mass care, including shelter and the provision of food and other essential needs;[27]

5. The need to take immediate steps to clear roads, build bridges, demolish unsafe structures, or erect temporary ones;[28]

6. The need to warn the public about a risk;[29]

7. The need to give priority to certain locales for applications for public housing and for repair and construction of public facilities;[30]

8. The need to allocate, on a temporary basis, materials necessary for construction;[31]

9. The need to take immediate steps to repair and restore certain nonprofit facilities, such as schools, hospitals, and utilities;[32]

10. The need to remove debris and wreckage;[33]

11. The need to take immediate steps to provide temporary rent-free housing or mortgage or rental payments;[34]

12. The need to provide extraordinary unemployment assistance, individual or family grants, and food stamps;[35]

13. The need to provide assistance to those in need of immediate psychiatric counseling;[36]

14. The need to set up emergency communications and transportation systems.[37]

It is obviously not possible, without specific facts, to opine on whether a particular set of facts constitutes an emergency or a major disaster. We have not found anything, either in the Act, its legislative history, or administrative practice under it, that would disqualify an emergency or major disaster merely because it involved a massive influx of aliens into the country. President Carter used the Act to declare an emergency during the Cuban boatlift, and the specifics of the damage being done to Florida at that time will no doubt aid others in evaluating

---

[24] 42 U.S.C. § 5142(a).
[25] 42 U.S C. § 5143(b)(3).
[26] 42 U S C § 5145
[27] 42 U S.C § 5146(a)(4)
[28] 42 U S.C. § 5146(a)(4)
[29] 42 U.S.C § 5146(a)(4).
[30] 42 U.S.C. § 5153(a).
[31] 42 U.S C. § 5158.
[32] 42 U.S C § 5172(b).
[33] 42 U S C § 5173.
[34] 42 U S C § 5174.
[35] 42 U S.C. §§ 5177, 5178.
[36] 42 U S.C. § 5183.
[37] 42 U.S C. §§ 5185, 5186

the merits of future requests. Not every immigration emergency will necessarily be an emergency or major disaster under the Act—the President must make separate determinations for each. We do not believe, however, that there is anything in the Act to preclude him from using the Act if he did determine that the requisite need and suffering existed.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*