COMMONWEALTH OF PUERTO RICO, Plaintiff,

v.

MUSKIE et al, Defendants.

MARQUEZ et al, Plaintiffs,

v.

CARTER et al, Defendants.

COLON et al, Plaintiffs,

v.

CARTER et al, Defendants.

Civ. A. Nos. 80–2117, 80–2104 and 80–2106.

United States District Court, D. Puerto Rico.

Jan. 5, 1981.

As Amended Jan. 9, 1981.

Michael J. Henke, Vinson & Elkins, Washington, D. C., Gerardo A. Carlo, San Juan, P. R., Néstor D. Ramírez-Cuebos, Dept. of Justice, Commonwealth of Puerto Rico, San Juan, P. R., for Commonwealth of Puerto Rico.

Pedro J. Saade Llorens, Río Piedras, P. R., for plaintiffs Jorge Colón et al.

Pedro J. Varela, Hato Rey, P. R., for plaintiffs Máquez Colón, et al.

Luis R. Dávila Colón, Dept. of State, Commonwealth of Puerto Rico, San Juan, P. R., for Commonwealth of Puerto Rico.

José E. Colón Santana, Josefina Pantoja, A. Santiago, Río Piedras, P. R., Fausto D. Godreau, Servicios Legales de Puerto Rico, Juana Diaz, P. R., for plaintiffs.

William Want and Dorothy Burakreis, U. S. Dept. of Justice, General Litigations Section, Sand Division, Washington, D. C., for defendants.

## DECISION AND ORDER

TORRUELLA, District Judge.

These cases arise as a result of the decision to transfer an indeterminate number of undocumented aliens[1] from various points of detention in Continental United States, principally in the State of Florida, to a Department of Defense facility known as Fort Allen, which is located in the Municipality of Juana Diaz in the Commonwealth of Puerto Rico.

### PROCEDURAL BACKGROUND

Three separate actions are involved in this matter. Civil Numbers 80–2104, and 80–2106 concern suits by individual citizens,[2] all nearby residents of Fort Allen (hereinafter collectively referred to as "Individual Plaintiffs"). The movant in Civil Number 80–2117 is the Commonwealth of Puerto Rico (hereinafter referred to as "the Commonwealth").

In Civil Number 80–2117, the Defendants are Edmund S. Muskie, Secretary of State, Harold L. Brown, Secretary of Defense, Clifford L. Alexander, Jr., Secretary of the Army, and John W. Macy, Jr., Director of the Federal Emergency Management Agency. In Civil Number 80–2104, President James Carter, Benjamin Civiletti, Secretary of Justice, Rear Admiral Arthur Knoizen, Commander Caribbean Naval Forces, as well as Secretary Brown[3] are named Defendants. Civil Number 80–2106 has the same Defendants as Civil Number 80–2104, except for the exclusion of Secretary Civiletti, and the inclusion of David W. Crossland, the Director of the Immigration and Naturalization Service.

Although the allegations in all three cases are similar, there are various significant differences. In 80–2117 the Commonwealth seeks declaratory and injunctive relief alleging violation of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., the National Historic Preservation Act, 16 U.S.C. § 470 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq., the Laws of Puerto Rico at 12 L.P.R.A. § 1131 and 32 L.P.R.A. § 3532, and various regulations of the Environmental Protection Agency, 40 C.F.R. Parts 122, 125, 240, 241 and 243. As will be discussed in greater detail later in this opinion, the substance of the Commonwealth's allegations are that the construction of a refugee camp in Fort Allen, and the subsequent transfer there of the refugees without compliance by Defendants with various prerequisites established in the mentioned legislation, entitles it to the relief sought barring said actions.

The complaint in Civil Number 80–2104 claims as additional grounds for relief that Defendants' action violates the Resource

---

1. Although the term "refugee" has been popularly ascribed to these persons, and is used hereafter in this Opinion, there is serious doubt whether many of these persons, particularly the Haitian nationals, would qualify as such in a technical sense pursuant to a strict interpretation of our immigration laws. Cf. 22 U.S.C. § 2601(b)(3); 8 U.S.C. § 1101(a)(42); see also Rosenberg v. Yee Chien Woo, 402 U.S. 49, 91 S.Ct. 1312, 28 L.Ed.2d 592 (1971) for a general overview of the term "refugee" in our immigration laws.

2. Other Plaintiffs originally appearing were dismissed for lack of standing.

3. Carlos Romero Barceló, the Governor of Puerto Rico, was originally named as Defendant in both this and Civil Number 80–2106, but the Court dismissed both cases against him in view of the fact that he appeared as a Plaintiff and that his interests were properly as a Party Plaintiff.

Conservation and Recovery Act, 42 U.S.C. § 6901 and is a violation of the Fifth and Fourteenth Amendments of the Constitution and of the Refugee Act of 1980 (P.L. 96–212), the Federal Relations Act of 1950, 48 U.S.C. § 731 et seq., and the United Nations Charter.

The allegations in Civil Number 80–2106 are substantially identical to 80–2104 and need not be further detailed.

Generally speaking Defendants answered these allegations denying the applicability of these various legislation, either by virtue of factual situations which were controverted, or by reason of specific legal exceptions allegedly contained in other legislation or in Presidential Executive Orders. These contentions will be the subject of detailed discussion herein.

INTERIM RELIEF AND ITS PROGENY

To say the least, this case has had a short but exciting life. Upon consolidation of these actions a hearing for preliminary injunction was held and evidence received on October 6, and 7, 1980. On October 8, 1980 a preliminary injunction was issued enjoining further construction at Fort Allen and the transferring of the refugees. An Opinion and Order was entered thereafter which is reported at 507 F.Supp. 1026 (D.C.P.R., 1980). For present purposes it is sufficient to state that the Court found that the construction of the refugee camp at Fort Allen and the proposed transfer there of the refugees, constituted a "major Federal action" within the meaning of Section 102(2)(c) of the National Environmental Protection Act (hereinafter called "NEPA"), 42 U.S.C. § 4332(2)(c), which requires the preparation and filing of an environmental impact statement (hereinafter called "EIS"), before such action is initiated, a procedure which Defendants had failed to comply with. In so ruling the Court concluded that the exemption to Section 102(2)(c) of NEPA contained in Section 405 of the Disaster Relief Act, (hereinafter called "DRA") (42 U.S.C. § 5175), as well as President Carter's May 6, 1980 declaration of emergency which allegedly triggered the application of the Sec-

tion 405 exemption, see 45 Fed.Reg. 32116–7 (May 6, 1980), was unavailable to Defendants because Section 102(1) of the law (42 U.S.C. § 5122(1)) defined the term "emergency" with reference to natural disasters, such as hurricanes, floods and earthquakes, and further because President Carter's declaration was limited to the State of Florida. The Court however sustained the validity of Executive Order Number 12244 issued on October 3, 1980, whereby pursuant to specific authorization contained in those statutes, Fort Allen was exempted from complying with the provisions of the Federal Water Pollution Control Act, supra, the Clean Air Act, supra, the Noise Control Act, supra, and the Solid Waste Disposal Act, supra. In issuing this Order, President Carter stated that this action was necessary "in the paramount interest of the United States." This is the first time since the enactment of this legislation that the President has exercised these powers.

On October 10, 1980, at 9:35 A.M. EST, Defendants filed a Motion for Reconsideration alleging as grounds therefor the provisions of the Refugee Education Assistance Act of 1980, Pub.L.No. 96–422 (hereinafter called "REAA"), Section 501(c) which exempted action furnishing "assistance ... for the processing, care, maintenance, security, transportation, and initial reception and placement in the United States of Cuban and Haitian entrants" from the EIS requirements of NEPA, and Executive Order Number 12246, wherein President Carter delegated his functions under Section 501(c) of REAA to the Secretary of State and directed him to "promptly take action which provides assistance for those Cuban and Haitian entrants located or to be located at Fort Indiantown Gap, Fort McCoy, Fort Chaffee, Fort Allen, existing processing and reception sites in Florida, and such other sites as he may designate ..." This Statute and the Executive Order were both signed into law at approximately 9:30 A.M. EST on October 10, 1980, while the President was on a campaign swing through the State of Florida (Executive Order 12246, 45 F.R. 68367, October 10, 1980).

After a hearing, the Court lifted the preliminary injunction as to the requirement that an EIS be prepared and filed before construction could proceed, but otherwise continued the injunction and held that the Executive Order was judicially reviewable pursuant to 5 U.S.C. § 706(2)(A), "with a high probability of Plaintiffs' success when the case [was] heard on the merits" in that the validation of the transfer of refugees in the face of the Court's specific findings of the probable health hazards to the refugees and nearby residents in such transfer constituted arbitrary and capricious agency action.

On October 24, 1980 the Court of Appeals reversed our Order granting the partial preliminary injunction. Thereafter a decision issued which is reported at (1st Cir.) 633 F.2d 964. It is important to an understanding of our present decision to discuss the contents of the same.

In answer to the Commonwealth's contention to the effect that the NEPA exception in Title V of REAA was inapplicable to the proposed transfer of refugees to Fort Allen, the Court of Appeals concluded that a principal purpose of this legislation was "providing an EIS exemption." It specifically declined to consider and decide the Commonwealth's allegation that other NEPA requirements were not exempted by REAA (see footnote 1 of the decision). The Court of Appeals further left open allegations pursuant to the National Historic Preservation Act, supra, and the Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. "[b]ecause the district court did not rule on or make any findings of fact in connection with these claims" (see footnote 4). The Court then went on to sustain the Defendants' appeal "that the executive order designating Fort Allen as a relocation site" was not subject to judicial review under 5 U.S.C. § 701 et seq. ruling that it is a decision "committed to the President's discretion by law and therefore unreviewable." The Court thus decided that the Commonwealth had failed to demonstrate a sufficient probability of success on the merits so as to justify the issuance of a preliminary injunction. The Court added, however:

"In announcing this conclusion, we deem it appropriate to note that we consider significant representations as to the relocation program made by the government in its papers and at argument: that no more than 2000 refugees are expected to be transferred to Fort Allen, that adequate sewage treatment facilities would be guaranteed, and that adequate security would be provided to ensure the safety of nearby residents, among others. We would expect the government to adhere fully to these representations throughout the implementation of the transfer."

On October 24, 1980, Mr. Justice Brennan issued a stay of the Court of Appeals' decision, which stay was vacated by the full Court on November 3, 1980.

The hearing on the permanent injunction was held commencing on November 20, 1980 and continuing intermittently through December 2, 1980 when a site visit was held. In the meantime, not only were refugees not transferred to Fort Allen, but in fact the case bordered on mootness as the Government considered placing this facility on inactive "caretaker status." The Court was informed that 10 days' notice would be given before the transfer of any refugees to Fort Allen. As the parties asked and received 30 days for the filing of briefs, the Court was lulled into the belief that it would be granted adequate time to decide the case before any action was taken by the Government.

The next episode commenced on December 8, 1980 with a conference call to the Court from Washington, D. C., by counsel for the Commonwealth and Defendants, in which the Court was informed that the Cuban-Haitian Task Force had decided to commence the transfer of refugees on December 10, 1980. The Court called and held a hearing on December 9, 1980 on this new development. At this hearing the Government filed an affidavit of the Director of the Cuban-Haitian Task Force to the effect that Fort Allen was ready for "at least 2,000 newly arriving or Haitian entrants." (Emphasis ours). Thereafter, pursuant to

the All Writs Act, 28 U.S.C. § 1651(a), and its inherent powers, the Court issued a stay against Defendants ordering the maintenance of the *status quo* at Fort Allen for a period of 30 days.

This Order was appealed to the Court of Appeals, who on December 18, 1980, issued its opinion refusing to set aside this "interim action conditioned upon [our] handing down an opinion on the merits by January 5, 1981."

Against this procedural maelstrom we look to the facts established on the record.

### THE FACTS

Approximately 122,000 Cuban and 9,500 Haitian refugees have entered the United States since April 21, 1980. Most of the refugees arrived by boat, landing in southern Florida, and were detained for processing at an abandoned military site near Miami. Cubans were generally processed at a portion of the site known as Krome North; Haitians at a portion known as Krome South.

As previously indicated, on May 6, 1980 President Carter, purporting to exercise authority granted by DRA, supra, declared that "an emergency exists in the State of Florida", and subsequently, an *ad hoc*, interagency Cuban-Haitian Task Force was formed to exercise overall supervision of the federal government's efforts to resolve the problems created by the influx of these aliens, including day-to-day operation of processing and resettlement centers and the coordination of efforts to resettle the refugees.

As the flow of incoming refugees continued and increased, additional holding stations were established at Eglin Air Force Base, Florida; Fort Chaffee, Arkansas; Fort Indiantown Gap, Pennsylvania; and Fort McCoy, Wisconsin. The combined capacity of these four facilities was 36,760 persons, broken down as follows:

| | |
|---|---|
| Eglin Air Force Base | 2,000 |
| Fort Chaffee | 19,000 |
| Fort Indiantown Gap | 5,760 |
| Fort McCoy | 10,000 |

Fort Chaffee, in particular, was well-suited to handle the Cuban-Haitian refugees. It had served as a center for housing Vietnamese refugees following the Vietnamese war, and has 467 permanent barracks—enough to house close to 20,000 refugees. There are also twenty-one mess halls, six medical clinics, and a hospital. Elaborate recreational facilities are available, including T.V. rooms, boxing rings, stage platforms for variety shows, ball fields, a gymnasium, volleyball and basketball courts, and the like. Water and sanitary facilities are adequate.

By June 20, 1980, more than 114,000 Cubans had already arrived and the bulk of the influx was over. On that day the State Department announced that it was adopting a special status to legitimize those Cuban and Haitian refugees who had entered the country during the emergency period; such persons were designated "Cuban-Haitian Entrants (status pending)" and as such, became eligible for a number of benefits, including SSI, AFDC, and emergency assistance. Later this special status was extended to all Cuban and Haitian refugees arriving before October 10, 1980.

As the summer wore on, refugees continued to arrive and, more important, many of the early arrivals proved difficult to relocate among the population at large.[4] With winter approaching, plans had to be made to accommodate the remaining refugees in heated and winterized facilities. Forts McCoy and Indiantown Gap were not winterized, and the cost of winterizing them was estimated to be in the tens of millions of dollars. Also, the Administration was under enormous pressures from political leaders in Florida to close Eglin Air Force Base to refugees.

---

4. In general, Cuban and Haitian refugees were detained at the various holding stations until a "sponsor" could be found to guarantee employment. Those refugees having relatives in the United States were usually placed rather quickly. However, those having no relatives in this Country—particularly young, single males—proved very difficult to relocate.

Accordingly, on or about August 5, 1980 the Administration announced that it would consolidate all Cuban and Haitian refugees in the four holding facilities at Fort Chaffee. At the insistence of the Governor of Arkansas, however, the number of refugees to be housed at Chaffee was arbitrarily limited to a maximum of 10,000, just over half the capacity of the facility.

As a result of the artificial limitation on the capacity of Fort Chaffee, a search was begun for an additional holding center. The General Services Administration compiled a list of more than fifty "prospective consolidation/relocation sites." Significantly, that document included no facilities in Puerto Rico. In late August a team of GSA investigators visited two of the possible sites—Richmond Naval Air Station and Key West Naval Air Station. GSA estimated that the Richmond facility could be made to accommodate 1,500 people at the cost of $1 to $2 million and that the Key West facility could be made to accommodate the same number at a cost of one and one-half to two and one-half million dollars. In early September the team made a detailed evaluation of the suitability of the two Krome sites for a more permanent refugee center. It was estimated that the two Krome sites could be modified to accommodate the same number of people for five to eight million dollars each.

Also in early September, the Undersecretary of the Army was asked to determine the capability of Fort Polk, Fort Huachuca, and Williams Air Force Base—three more of the facilities on GSA's list—to house from 2,000 to 10,000 refugees "for an indefinite period of time." For various reasons, it was determined that none of those facilities had the capability to accommodate the designated number of refugees.

On or about September 8, 1980 the two Krome camps were cited by the Florida Department of Health and Rehabilitation Services for various violations of the Florida statutes and sanitary code and those facilities were ordered to cease operation by October 23, 1980.

On September 16, 1980, for no reason apparent from the record, the Director of Military Support ("DOMS") was "directed to investigate the feasibility of establishing a processing facility for approximately 3,000 Cubans and Haitians in Puerto Rico." The DOMS made plain his own position that—even after the Florida camps were closed—newly arriving refugees "should be housed in existing DOD processing facilities that are already staffed and capable of receiving and processing the anticipated numbers of people." Recognizing that this most rational of alternatives might nonetheless be "unacceptable to the White House", Brigadier General Moore, acting DOMS, identified two possible sites in Puerto Rico for refugee relocation—Fort Allen and Ramey Air Force Base. Apparently, General Moore had been informed in advance of the White House position, for just two days later, on September 18, 1980, survey teams departed for Puerto Rico "at the direction of the White House" to study the facilities at Allen and Ramey. As of that date—and without any other explanation than the White House "directive"—all "other installations" were eliminated from consideration.[5]

In its Memorandum of September 22, 1980 the survey team described Fort Allen as "the least desirable in terms of space and support facilities", requiring a "major effort" to construct housing and sanitation facilities, lacking mess facilities, with "minimal" security and "inadequate" sewage disposal. On the same day the Secretary of the Army received a report stating that: "Fort Allen is not a logical choice for the mission now being proposed." And in an "Eyes Only" telex of September 23, Major General Duckman, Commander of the United States Army at Fort Gelton, Georgia, reported to Lieutenant General Horace, Commander of the First Army at Fort Meade, Major General Graham, Deputy

5. So far as the record reflects, only five of the more than 50 prospective relocation sites identified by GSA had been examined. Two of those (Richmond and Key West) had been found suitable to house at least 1,500 refugees at a relatively modest cost.

Chief of Operations and Brigadier General Moore, Deputy Director of Operations, that the selection of Fort Allen "is a grave mistake."

On the next day, however, Fort Allen was selected by the Cuban-Haitian Task Force as the site and Admiral Arthur K. Knoizen, Commander of Naval Forces in the Caribbean, was informed orally of the decision. On September 26, Admiral Knoizen received written orders,

"... to take a base (Fort Allen) which was within a very few days of being totally closed, locked. It had been boarded up. The telephones and furniture and everything removed and I was directed to reopen the base, staff it with the personnel to handle Cuban and Haitian refugees problem and to construct the camp with a maximum capacity of 5,000 Cubans or Haitians in whatever mix was elected to be completed and ready to receive the first ones by the 8th of October which was a matter of 15 days from starting." [6]

Work at Fort Allen began on the 25th of September.

On September 26, 1980 Mariel Harbor in Havana was closed thus shutting off the flow of Cuban refugees into the United States and decreasing the need for refugee housing in this Country. Haitians continued to arrive albeit in reduced numbers in October and early November and their number in South Florida awaiting resettlement was reduced to a low of 198 on November 17, 1980. Since that time the Haitian arrivals have increased and their number in South Florida has climbed to 583 as of December 8, 1980.[7]

On September 29, 1980 a so-called preliminary environmental assessment was written in longhand. It was typed on September 30, with some changes. The assessment concluded that there would be no significant environmental impact from the project. That assessment constitutes the entire record of the Government's environmental assessment of Fort Allen.

Fort Allen occupies a low-lying area of approximately 940 acres in the Southern part of Puerto Rico, where it abuts several wards of Juana Diaz, a Municipality of Puerto Rico, and is near the town of Juana Diaz. The base is surrounded by a fence and contains various barracks, and administrative and recreational buildings, none of them to be used by the refugees, as well as complementary support facilities consistent with a base whose population never exceeded 1,500 persons (its usual number ranged in the vicinity of 500 to 800). During World War II, Fort Allen was a fighter base and it is on the remains of the asphalt and concrete runways that the refugee compound was erected.

In other times and circumstances the so-called refugee facility would be referred to as a concentration camp. It is surrounded by an outer perimeter chain link fence, ten feet in height, topped by concertina type barbed wire. Immediately inside of this fence is a bare security corridor, approximately twenty yards in width, inside of which are 14 compounds also surrounded by a chain link fence topped with concertina wire. Within each compound there are twelve living tents, framed in wood and covered by canvas. Each tent will house from 20 to 30 refugees. Each compound also has administrative, medical and sanitary tents. The Haitian and Cuban [8] refu-

---

6. The base was being closed by the Navy so that it could be turned over to the Puerto Rican National Guard for use as a training center. A Memorandum of understanding had been signed by the Army, the Puerto Rican National Guard, and the United States Army Reserve to this effect, and the district engineers from Jacksonville were in Puerto Rico the week of September 24 to effect the transfer. The facility was much needed by the National Guard because its existing facility is overcrowded.

7. At this point in time the Government lacks any firm estimate as to how long and to what extent this inflow of illegal aliens will continue, nor has it shown any demonstrable interest in taking any action to stem this tide. On the contrary it appears to be embarked on a course of conduct which is only short of open encouragement.

8. Under the present posture of things it is unlikely that any but Haitians will be interned at Fort Allen, thus converting it into a de facto Haitian ghetto.

gees will be segregated from one another and there will be separate housing for single males and females. A separate compound will house the problem, or Level II inmates.

The tropical climate of the area is extremely hot, and inside the tents it is even hotter. There is no natural shade whatsoever in or around the refugees compound and the prevailing winds during daylight hours cause a considerable amount of dust and dirt to fly about. At this time no sport or recreational facilities exist. Present plans call for the staffing and care of the medical needs of the refugees using existing and reconditioned facilities at Fort Allen, supplemented by those of Roosevelt Roads Naval Station in Ceiba, Puerto Rico.

The support personnel to operate the camp will be in the vicinity of 1,000 persons, out of which about 400 will be living full time on base. Taking the proposed refugee population at 2,000, a figure which recent developments (and the admitted camp's capacity of 5,000) would indicate to be grossly underestimated, the total waste water generated at Fort Allen through the existing treatment plant will greatly exceed its 1500-persons capacity. This will result in improperly treated sewage traversing the open ditch through the El Pastillo community nearby, on its way to dumping in the Caribbean Sea.

The approximately 15,000 pounds per day of solid waste expected to be generated by the Fort Allen refugee operation, will be off loaded at Juana Diaz Municipal Dump. That landfill operation, however, is already severely overloaded, has difficulties with flooding, and has been known to permit solid waste to be carried downstream through the coastal zone and into the Caribbean Sea.

*Issues Related to NEPA and other Environmental Statutes*

Plaintiffs contend that Defendants' decision to accommodate refugees at Fort Allen violates Section 102 of NEPA, 42 U.S.C. § 4332. Defendants have responded by asserting that their actions respecting Fort Allen were specifically exempted from the requirements of NEPA by virtue of the provisions of the Disaster Relief Act ("DRA"), 42 U.S.C. § 5175, and the Refugee Education Assistance Act ("REAA").

1. *The DRA exemption.*

The exemption to NEPA in Section 405 of DRA reads as follows (42 U.S.C. § 5175):

"No action taken or assistance provided pursuant to section 5145, 5146, or 5173 of this title, or any assistance provided pursuant to section 5172 or 5189 of this title that has the effect of restoring facilities substantially as they existed prior to the disaster, shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969. Nothing in this section shall alter or affect the applicability of the National Environmental Policy Act of 1969 to other Federal actions taken under this chapter or under any other provision of law."

In a letter dated May 6, 1980, President Carter declared an emergency as follows:

"I have determined that the impact on State and local governments in Florida due to the arrival of large numbers of *undocumented aliens* beginning on or about April 13, 1980, is of sufficient severity and magnitude to warrant a declaration of an emergency under Public Law 93–288. *I therefore declare that such an emergency exists in the State of Florida.* Further, the humanitarian aspects of this exodus from Cuba cannot be ignored." (Emphasis supplied).

This document served as the basis for a "Notice of Emergency and Related Determinations; Florida" issued by William Wilcox, Associate Director, Disaster Response and Recovery, Federal Emergency Management Agency, in which he states:

"I do hereby determine *the following areas of the State of Florida to have been affected adversely by this declared emergency.*

The Counties of Broward, Dade, Monroe and Palm Beach for assistance as follows:

Effective April 13, 1980, the local governments in the designated counties are eligible for extraordinary expenses incurred as a result of this incident that are beyond those encountered in the normal course of government operations." (Emphasis supplied).

See F.R.Doc. 80–14906, filed May 14, 1980 at 8:45 A.M., 45 Fed.Reg. 32116–7 (May 15, 1980).

As previously indicated, this Court in its October 8, 1980 decision, ruled that the President's declaration of emergency for the State of Florida was not authorized by DRA's definition of "emergency", wherefore NEPA's Section 102 requirements impeded the Fort Allen transfer of refugees.

Although we are not impeded by the doctrine of law of the case, from altering a previous ruling under appropriate circumstances (see *Cochran v. M & M Transportation Co.*, 110 F.2d 519, 521 (C.A. 1, 1940)), such circumstances are not present herein. In fact, subsequent events confirm our ruling to the effect that the President was without authority to declare an emergency pursuant to DRA. The legislative history of REAA, in the House Report on Title V, explains that it was enacted:

... "to provide the President the authority to run the Cuban-Haitian task force *in the absence of the emergency authorities originally used for this purpose by the Federal Emergency Management Agency (FEMA) which were not intended to handle situations of this nature.*" Cong.Rec. H10122 (daily ed. Sept. 30, 1980) (emphasis added).

■ We thus reaffirm our previous ruling to the effect that neither the provisions of Section 405 of DRA, supra, nor the President's declaration of emergency of May 6, 1980, provide the basis for exempting the refugee transfer and related Federal actions from the provisions of Section 102 of NEPA, supra.

2. *The actions under the Federal Water Pollution Control Act, the Clean Air Act, the Noise Control Act and the Solid Waste Disposal Act.*

On October 3, 1980, approximately nine days after Fort Allen was selected by the Cuban-Haitian Task Force as the relocation site for the refugees, the President issued Executive Order 12244 (filed in the Federal Register at 10:44 A.M. of October 6, 1980, 45 F.R. 66,443).

In this Executive Order, the President exercised specific authority conferred by Section 313(a) of the Federal Water Pollution Control Act, supra,[9] Section 118 of the

---

**9.** 33 U.S.C.A. § 1323:

"(a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any record-keeping or reporting requirement, any requirement expecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.

This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. Nothing in this section shall be construed to prevent any department, agency, or instrumentality of the Federal Government, or any officer, agent, or employee thereof in the performance of his official duties, from removing to the appropriate Federal district court any proceeding to which the department, agency, or instrumentality or officer, agent, or employee thereof is subject pursuant to this section, and any such proceeding may be removed in accordance with section 1441 et seq. of Title 28. No officer, agent, or employee of the United States shall be personally liable for any civil penalty arising from the performance of his official duties, for which he is not otherwise liable, and the United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court. The President may exempt any effluent source of any department, agency, or instrumentality

Clean Air Act, supra,[10] Section 4(b) of the Noise Control Act, supra [11] and Section 6001 of the Solid Waste Disposal Act, supra,[12] to Fort Allen. Pursuant to its terms "every

in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so; except that no exemption may be granted from the requirements of section 1316 or 1317 of this title. No such exemptions shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting such exemption. In addition to any such exemption of a particular effluent source, the President may, if he determines it to be in the paramount interest of the United States to do so, issue regulations exempting from compliance with the requirements of this section any weaponry, equipment, aircraft, vessels, vehicles, or other classes or categories of property, and access to such property, which are owned or operated by the Armed Forces of the United States (including the Coast Guard) or by the National Guard or any State, and which are uniquely military in nature. The President shall reconsider the need for such regulations at three-year intervals."

**10.** 42 U.S.C.A. § 7418:

"(a) Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge of air pollutants, and each officer, agent, or employee thereof, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. No officer, agent, or employee of the United States shall be personally liable for any civil penalty for which he is not otherwise liable.

(b) The President may exempt any emission source of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so, except that no exemption may be granted from section 7411 of this title, and an exemption from section 7412 of this title may be granted only in accordance with section 7412(c) of this title. No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. In addition to any such exemption of a particular emission source, the President may, if he determines it to be in the paramount interest of the United States to do so, issue regulations exempting from compliance with the requirements of this section any weaponry, equipment, aircraft, vehicles, or other classes or categories of property which are owned or operated by the Armed Forces of the United States (including the Coast Guard) or by the National Guard of any State and which are uniquely military in nature. The President shall reconsider the need for such regulations at three-year intervals. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting each such exemption."

**11.** 42 U.S.C.A. § 4903:

"(b) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government—

(1) having jurisdiction over any property or facility, or

(2) engaged in any activity resulting, or which may result in the emission of noise, shall comply with Federal, State, interstate, and local requirements respecting control and abatement of environmental noise to the same extent that any person is subject to such requirements. The President may exempt any single activity or facility, including noise emission sources or classes thereof, of any department, agency, or instrumentality in the executive branch from compliance with any such requirement if he determines it to be in the paramount interest of the United

effluent source" (water), "each and every particular emission source" (air), "each and every single activity or facility, including noise emission sources or classes thereof", and "each and every solid waste management *facility*" (emphasis supplied), located at Fort Allen were exempt from the respective statutes. The President found that these actions were necessary "in the paramount interest of the United States", and "in order to provide for the immediate relocation and temporary housing of Haitian and Cuban nationals, who [were] located in the State of Florida" to Fort Allen.

It is thus clear from the language of this order that the President himself designated Fort Allen as the relocation site for the refugees. It is therefore a sterile and unproductive argument to consider, as Plain-

tiffs would have us do, whether Defendants are now estopped from denying that this decision was in fact taken by the Cuban-Haitian Task Force, as was asserted on numerous occasions by Defendants throughout these proceedings. Whether in fact the decision was by said agency, or by Dr. Eugene Eidenberg, the Secretary of the Cabinet and Assistant to the President for Intergovernmental Affairs, as is claimed by the Defendants, once the October 3 order was signed by the President,[13] together with the previously mentioned legal findings, the designation of Fort Allen became *de jure* a presidential decision.

The Court of Appeals, in discussing this language and the related provisions of Section 501(c)(1)(A) of REAA indicates that "[i]t is difficult to imagine a determination

·States to do so; except that no exemption, other than for those products referred to in section 4902(3)(B) of this title, may be granted from the requirements of sections 4905, 4916, and 4917 of this title. No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods of not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting such exemption."

12. 42 U.S.C. § 6961:
"Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any solid waste management facility or disposal site, or (2) engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, Interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waste disposal in the same manner, and to the same extent, as any person is subject to such requirements, in-

cluding the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief. The President may exempt any solid waste management facility of any department, agency, or instrumentality in the executive branch from compliance with such a requirement if he determines it to be in the paramount interest of the United States to do so. No such exemption shall be granted due to lack of appropriation unless the President shall have specifically requested such appropriation as a part of the budgetary process and the Congress shall have failed to make available such requested appropriation. Any exemption shall be for a period not in excess of one year, but additional exemptions may be granted for periods not to exceed one year upon the President's making a new determination. The President shall report each January to the Congress all exemptions from the requirements of this section granted during the preceding calendar year, together with his reason for granting each such exemption."
Claims under the Solid Waste Disposal Act also dispose of claims under the Resource Conservation and Recovery Act of 1976. See Note at 42 U.S.C.A. § 6901.

13. As well as the October 10, 1980 Executive Order (Executive Order Number 12246, 45 F.R. 68,367–October 10, 1980), which directs assistance under the REAA to entrants "located or to be located at ... Fort Allen."

more fully committed to discretion or less appropriate to review by a court", and thus unreviewable under the provisions of the Administrative Procedures Act, 5 U.S.C. § 701(a)(2). See *Carter, et al v. Colon, et al,* at p. 1029.

We of course are duty bound to give full support and compliance to the rulings of our Court of Appeals [14] and will do so.

But in examining this Presidential order and its supporting legislation we need not go beyond that which was in fact exempted by its own explicit language, since we are dealing with legislation in which Congress has spoken in the plainest of words and accorded the highest of priorities. Cf. *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

In our opinion of October 8, 1980 we upheld the validity of this order and the exemptions created by it. We reaffirm this decision, but upon closer analysis of this order and one of the statutes upon which it is based, we conclude that with respect to the exemption from the Solid Waste Disposal Act, supra, said exemption is limited in scope and does not encompass the full range of the proven consequences of the refugee activities at Fort Allen.

The evidence is uncontradicted to the effect that the refugee operation will generate a large amount of solid waste, which will in turn severely tax the civilian landfill operations of the Municipality of Juana Diaz. The reason for this is that *Fort Allen itself has no solid waste management facility.* Yet it is *only* such a facility that can be exempt by the President under Section 6001 of the Solid Waste Disposal Act, supra, and it is *only* such a facility that is exempt by the Presidential Order. Under this statute, in contrast with the other mentioned Statutes,[15] there is a distinction between "solid waste management facility or disposal site" (42 U.S.C. § 6961(1)), which the President can exempt, and an "activity resulting, or which may result, in the disposal of solid waste or hazardous waste" (42 U.S.C. § 6961(2)), which the President has no authority to exempt.

■ The Fort Allen refugee camp, not having a solid waste disposal facility or site, falls within the purview of 42 U.S.C.

---

14. We must add that we can understand the solid basis for the Court's ruling. We cannot but say however, in this particular case, that this determination could result in an irreparable injustice to Plaintiffs.

In this case, the circumstantial evidence is overwhelmingly to the effect that far from being a decision "in the paramount interest of the United States", this was a decision taken to satisfy the President's partisan political interests. This would not be the first time that similar claims are made by those in high office, with somewhat less success than here, we might add. Cf. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The injustice of this situation is particularly poignant when we consider that Plaintiffs, citizens of the United States but residents of Puerto Rico, lack the political rights of their Continental counterparts and are thus without even the theoretical counter-balance provided by the right to vote, against any possible executive abuse of power. It would seem that under those circumstances it would be appropriate to promote some type of stricter judicial surveillance, perhaps by placing the residents of territories on a similar status vis-a-vis the United States as are other special classes of citizens, such as Indians. These of course, are uncharted waters for a district court.

15. The Federal Water Pollution Control Act, supra, allows the President to "exempt any effluent *source*" (emphasis supplied); the Clean Air Act, supra, permits exemption of "any emission *source*" (emphasis supplied); and the Noise Control Act, supra, which like the present statute talks about "property or facility" (42 U.S.C. § 4903(b)(1)) and "activity resulting, or which may result, in the emission of noise" (42 U.S.C. § 4903(b)(2)), grants the President authority to exempt *both* single activities *and* facilities, "including noise emission *sources or classes.*" (emphasis supplied).

House Report No. 94–1491, in analysing the scope of the Presidential authority to exempt under Section 6001 states (1976 U.S.Code Cong. and Adm.News p. 6305): "Subsection (c) authorizes the President or his designee to grant an exception to any *facility or activity* of the federal government, from compliance with the *hazardous waste* title of this bill ..." (emphasis supplied) This subsection was thus originally intended to exempt only "hazardous waste". When enacted however, Congress dropped that distinction, but limited the President's exemption power to "any solid waste management *facility*" (emphasis supplied).

§ 6961(2), and thus the solid waste producing *activity* is not exempt. Defendants are thus in violation of 42 U.S.C. § 6961.

3. *The NEPA, the REAA and the Executive Order of October 10, 1980.*

Although some of the parts of Section 102 of NEPA, supra, are not totally relevant to the issues at hand, they are of aid in comprehending the full scope of its intended application:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unqualified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to State, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter." (42 U.S.C. § 4332).

The Congressional policies to which Section 102(1) makes reference, are those contained in Section 101 (42 U.S.C. § 4331):

"(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing sorroundings;

(3) attain the widest range of beneficial uses of environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."

This national environmental policy has been described as being "as broad as the

mind can conceive." *Nucleus of Chicago Homeowners Ass'n. v. Lynn,* 524 F.2d 225 (C.A. 7, 1975), cert. den. 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

As previously indicated, on October 8, 1980, we issued a preliminary injunction barring construction of the refugees' camp and their transfer to Fort Allen, concluding that Defendants' failure to prepare and file an EIS violated Section 102(C) of NEPA.

Thereafter, Congress on October 10, 1980 passed REAA and the President signed Executive Order 12246, supra.

In its pertinent Section, REAA provides:

"Sec. 501(a)(1) The President shall exercise authorities with respect to Cuban and Haitian entrants which are identical to the authorities which are exercised under chapter 2 of title IV of the Immigration and Nationality Act. The authorizations provided in section 414 of that Act shall be available to carry out this section without regard to the dollar limitation contained in section 414(a)(2).

(b) In addition, the President may, by regulation, provide that benefits granted under any law of the United States (other than the Immigration and Nationality Act) with respect to individuals admitted to the United States under section 207(c) of the Immigration and Nationality Act shall be granted in the same manner and to the same extent with respect to Cuban and Haitian entrants.

(c)(1)(A) Any Federal agency may, under the direction of the President, provide assistance (in the form of materials, supplies, equipment, work, services, facilities, or otherwise) for the processing, care, maintenance, security, transportation, and initial reception and placement in the United States of Cuban and Haitian entrants. Such assistance shall be provided on such terms and conditions as the President may determine.

(B) Funds available to carry out this subsection shall be used to reimburse State and local governments for expenses which they incur for the purposes described in subparagraph (A). Such funds may used to reimburse Federal agencies for assistance which they provide under subparagraph (A).

(2) The President may direct the head of any Federal agency to detail personnel of that agency, on either a reimbursable or nonreimbursable basis, for temporary duty with any Federal agency directed to provide supervision and management for purposes of this subsection.

(3) The furnishing of assistance or other exercise of functions under this subsection shall not be considered a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

. . . . .

(d) The authorities provided in this section are applicable to assistance and services provided with respect to Cuban or Haitian entrants at any time after their arrival in the United States, including periods prior to the enactment of this section.

(e) As used in this section, the term "Cuban and Haitian entrant" means—

(1) any individual granted parole status as a Cuban-Haitian Entrant (Status Pending) or granted any other special status subsequently established under the immigration laws for nationals of Cuba or Haiti, regardless of the status of the individual at the time assistance or services are provided; and

(2) any other national of Cuba or Haiti—

(A) who—

(i) was paroled into the United States and has not acquired any other status under the Immigration and Nationality Act;

(ii) is the subject of exclusion or deportation proceedings under the Immigration and Nationality Act; or

(iii) has an application for asylum pending with the Immigration and Naturalization Service; and

(B) with respect to whom a final, nonappealable, and legally enforceable order of deportation or exclusion has not been entered."

The Executive Order states as follows:

"By the authority vested in me as President of the United States of America by Section 501 of the Refugee Education Assistance Act of 1980 and Section 301 of Title 3 of the United States Code, and in order to provide for assistance to be made available relating to Cuban and Haitian entrants, it is hereby ordered as follows:

1–101. All the functions vested in the President by Section 501(c) of the Refugee Education Assistance Act of 1980, are hereby delegated to the Secretary of State.

1–102. In carrying out the functions delegated to him by this Order, the Secretary of State shall ensure that among the actions he takes or directs from time to time, he shall promptly take action which provides assistance for those Cuban and Haitian entrants located or to be located at Fort Indiantown Gap, Fort McCoy, Fort Chaffee, Fort Allen, existing processing and reception sites in Florida, and such other sites as he may designate."

Thereafter, as previously indicated, our lifting of the injunction regarding construction was upheld by the Court of Appeals, but not our holding that the President's actions were reviewable under the Administrative Procedures Act, supra. We thus pass onto the unresolved questions.

### a. *The Scope of the REAA Exemption*

■ Let us commence by saying that the Court of Appeals' ruling to the effect that the President's action is unreviewable under the Administrative Procedures Act (APA) does not foreclose Plaintiffs' claim that Defendants have violated other NEPA requirements than those related to the EIS. We reach this conclusion on the basis of the obvious language of footnote 1 of that opinion and because established case law makes clear that federal action may well be committed to agency discretion so as to be unreviewable under the APA, yet still be subject to the requirements of NEPA.

■ In *Concerned About Trident v. Schlesinger*, 400 F.Supp. 454 (D.D.C., 1975), modified in 555 F.2d 817 (C.A.D.C., 1977), Plaintiffs challenged a federal decision to construct a support facility for the Trident submarine program at Bangor, Washington. Defendants argued—and the court held—that the decision at issue,

... "relating to the national defense and national security lie within that narrow band of matters wholly committed to official discretion both because of the delicate security issues they raise and the constitutional delegation of those concerns to the political departments of our government." 400 F.Supp. at 482.

However, the trial court found, "this is not to say that the courts cannot inquire into the facts of such decisions to see that all applicable laws (including NEPA) were complied with." *Id.* at 482–83. The Court of Appeals affirmed this holding, 555 F.2d at 822–23, and, indeed, found a violation of NEPA, *id.* at 830. Cf. *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979) (lack of standards for APA review under 5 U.S.C. § 301 may be remedied by reference to 28 U.S.C. § 1905 which places "substantive limits on agency action" under the former statute). The case law thus makes clear that NEPA can and does supply standards for review even where the statute under which agency action is taken contains no standards.

■ In a recent holding concerning NEPA review, the Court of Appeals for this Circuit explained that "there are two aspects to a court's review of an agency decision subject to the requirements of NEPA." First, "the court makes a substantive review of the agency's action to determine if such action is arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. § 706." Such review requires that the court "assure itself that the agency has given good faith consideration to the environmental consequences of its action."[16] Second, the reviewing court "must assess

---

16. In the words of the Supreme Court, the agency must take a "hard look" at the environmental consequences of its proposed action.

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

the agency's compliance with the duties NEPA places upon it. These duties are 'essentially procedural.'" *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (C.A. 1, 1980).

The interplay between the substantive and procedural review mandated by NEPA has been more fully developed by the Fifth Circuit in *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123 (C.A. 5, 1974). There the Court examined the "preliminary question" whether Section 101 of NEPA "provides 'law to apply' standards governing the substance of the agency decision." Noting that "to date the Fourth, Eighth, and the District of Columbia Circuits find that NEPA does establish substantive 'law to apply'", the Fifth Circuit held that "the majority and better reasoned rule favors such review." "We therefore hold that the broad and general provisions of Section 101 do delineate sufficiently definite standards to permit a meaningful, albeit limited, review." 492 F.2d at 1139. Separately, the Fifth Circuit noted that § 102(2)(A)–(H) specify procedural requirements for federal action. Id. at 1130–38. The court explained that subsections 102(2)(A), (B) and (D)–(H) "contain directives that are intended to insure the integration of sound environmental planning principles and methods into normal agency procedures", while the "principal thrust" of Section 102(2)(C) "is to require documentation." Id. at 1132. Addressing itself specifically to Section 102(2)(D), which is now Section 102(2)(E), the court noted that this section is

> ... "clearly ... supplemental to and more extensive in its commands than the requirement of Section 102(2)(C)(iii). It was intended to emphasize an important part of NEPA's theme that all change was not progress and to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means.... The imperative directive is a thorough consideration of all appropriate methods

of accomplishing the aim of the action, including those without the area of the agency's expertise and regulatory control as well as those within it." Id. at 1135.

In an earlier decision, the Eighth Circuit Court of Appeals had emphasized the substantive aspect of NEPA review. See *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (C.A. 8, 1972). There the Court stated:

> "The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives.
>
> . . . . .
>
> The agency must give environmental factors consideration along with economic and technical factors.
>
> . . . . .
>
> [C]ourts have an obligation to review substantive agency decisions on the merits." Id. at 298.

As the District Court explained in *Trident*, Section 101 of NEPA

> ... "charges federal officials with the responsibility to incorporate the consideration of environmental factors into the decisionmaking process.
>
> . . . . .
>
> The NEPA standard of review to be applied to the substantive DOD-Navy decision to proceed with the Trident system is whether or not the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." 400 F.Supp. at 480.

Although it is a case that deals with the requirements of Section 102(2)(C) & (D) of NEPA, the general tonic for interpretation of *all* of Section 102 was spelled out in no uncertain terms by the Court of Appeals for the District of Columbia in *Calvert Cliffs' Coord. Com. v. United States A. E. Com'n.*, 449 F.2d 1109 (C.A.D.C., 1971). The Court there stated at 449 F.2d 1112–1113:

"Thus the general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. However, the Act also contains very important 'procedural' provisions—provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance.

NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department.

. . . . .

Perhaps the greatest importance of NEPA is to require ... agencies to *consider* (emphasis in the original), environmental issues just as they consider other matters within their mandates. This compulsion is most plainly stated in Section 102. There, 'Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act ...' Congress also authorizes and directs that '(2) all agencies of the Federal Government shall' follow certain rigorous procedures in considering environmental values. Senator Jackson, NEPA's principal sponsor, stated that '[n]o agency will [now] be able to maintain that it has no mandate or no requirement to consider the environmental consequences of its action.' He characterized the requirements of Section 102 as 'action-forcing' and stated that '[o]therwise, these lofty declarations [in Section 101] are nothing more than that.'

The sort of consideration of environmental values which NEPA compels is clarified in Section 102(2)(A) and (B). In general, all agencies must use a 'systematic, interdisciplinary approach' to environmental planning and evaluation 'in decisionmaking which may have an impact on man's environment.' In order to include all possible environmental factors in the decisional equation, agencies must 'identify and develop methods and procedures .... which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.' 'Environmental amenities will often be in conflict with' economic and technical considerations. To 'consider' the former 'along with' the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance.

To ensure that the balancing analysis is carried out and given full effect, Section 102(2)(C) requires that responsible officials of all agencies prepare a 'detailed statement' covering the impact of particular actions on the environment, the environmental costs which might be avoided, and alternative measures which might alter the cost-benefit equation. The apparent purpose of the 'detailed statement' is to aid in the agencies' own decision making process and to advise other interested agencies and the public of the environmental consequences of planned federal action. Beyond the 'detailed statement', Section 102(2)(D) requires all agencies specifically to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'
[*NOTE*: The reference to Section 102(2)(D) in this and other similar opinions is actually to the present day Section *102(2)(E)*. When NEPA was amended on August 9, 1975, a new sub-paragraph (D) was added and the old sub-paragraph (D) was redesignated (E)]

This requirement, like the 'detailed statement' requirement, seeks to ensure that each agency decision maker has before him and takes into proper account all

possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal 'detailed statement' and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.

Of course, all of these Section 102 duties are qualified by the phrase 'to the fullest extent possible.' We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts.

Unlike the substantive duties of Section 101(b) which require agencies to 'use all practicable means consistent with other essential considerations', the procedural duties of Section 102 must be fulfilled to the 'fullest extent possible.' This contrast in itself, is revealing. But the dispositive factor in our interpretation is the expressed views of the Senate and House conferees who wrote the 'fullest extent possible' language into NEPA. They stated:

'... The purpose of the new language is to make it clear that each agency of the Federal Government shall comply with the directives set out in ... [Section 102(2)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible .... Thus, it is the intent of the conferees that the provision "to the fullest extent possible" shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in Section 102. Rather, the language in Section 102 is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section "to the fullest extent possible" under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance.'

Thus the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* (emphasis in the original) authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance.

We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decision making process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: 'It is hard to imagine a clearer or stronger mandate to the Courts.'" (Footnotes omitted).

We not only fail to see "clear conflict of *statutory* authority" between Section 102 of NEPA and Section 501 of REAA, we do not see any conflict at all.

The exemption to NEPA under Section 501(c)(3) of REAA is *limited* to a declaration that "the furnishing of assistance or other exercise of function" under this subsection is not to be considered a "major Federal action significantly affecting the quality of the human environment" within

the meaning of NEPA. The term "major Federal action" is a term of art which is *only* used in Section 102(2)(C) and (D) of NEPA. It is not to be found anywhere else in this Statute. It has special meaning because only "major federal action" triggers the requirements of an EIS under subparagraph (C) or the funding prohibitions under subparagraph (D). But the requirements of other parts of Section 102 must be complied with, independently of whether an EIS need not be filed, because the action has been specially tailored a "non-major" Federal action.

On this subject the Second Circuit said in *Trinity Episcopal School v. Romney Corp.*, 523 F.2d 88 (C.A. 2, 1975) that

> ... "federal agencies must consider alternatives under § 102(2)(D) of NEPA *without regard to the filing of an EIS* and this obligation is phrased to encompass a broad type of consideration—'study, develop, and describe.'"

> .　　.　　.　　.　　. .

> "[W]here (as here) the objective of a major federal project can be achieved in one of two or more ways that will have differing impacts on the environment, *the responsible agent is required to study, develop and describe each alternative for appropriate consideration.*" *Id.* at 93 (emphasis added).

And in *Natural Resources Defense Council v. Callaway*, 524 F.2d 79 (C.A.2, 1975), the Court emphasized the applicability of § 102(2)(D) to *all* federal actions:

> "[T]he development and discussion of a wide range of alternatives to *any proposed federal action* is so important it is mandated by NEPA when any proposal 'involves unresolved conflicts concerning alternative uses of available resources', 42 U.S.C. § 4332(2)(D). This requirement is independent of and of wider scope than the duty to file the EIS...." *Id.* at 92–93 (emphasis added).

See also *Montgomery v. Ellis*, 364 F.Supp. 517 (N.D.Ala., E.D.1973); Cf. *Public Serv. Co. v. U. S. Nuclear Regulatory Com'n.*, 582 F.2d 77, 85 (footnote 17) (C.A.1, 1978), cert. den. 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978).

■ We must assume that Congress, who fathered NEPA, could easily have used language exempting all actions under REAA from the full import of all of Section 102, if such was its intention. We cannot conclude that the restrictive language in Section 501(c)(3) of REAA is the result of legislative oversight. Thus the REAA exemptions excuse compliance only with the EIS requirement in Section 102(2)(C) and other requirements in subparagraph (D). There are, however, a number of other substantive and procedural requirements in NEPA that must be complied with regardless of whether the action is a "major federal action significantly affecting the quality of the human environment." Notably, Section 101(b), supra, which requires that federal agencies "use all practicable means ... to improve and coordinate Federal plans, functions, programs, and resources" to preserve and enhance the environment, and Section 102(2)(E) that imposes a procedural requirement that federal agencies "study, develop and describe appropriate alternatives" to proposed federal actions.

See *Aertsen v. Landrieu*, 637 F.2d 12 at pages 19–20 decided by the Court of Appeals for the First Circuit (1980).

IT IS SO ORDERED.

b. *The Presidential Delegation of Powers*

At this point we must interject that action taken pursuant to Executive Order 12246 of October 10, 1980 is not on the same footing as that under Executive Order 12244 of October 3, 1980. The very language of the Executive Order delegates all of the President's functions under Section 501(c) of the REAA to the Secretary of State. Thus any decisions or actions concerning Fort Allen pursuant to Section 501(c) from and after October 10 were necessarily actions of the Secretary of State or of his delegate, the Cuban-Haitian Task Force and not actions of the President. See *Amalgamated Meat Cutters and Butcher Workers v. Connally*, 337 F.Supp. 737, 761

(D.D.C.1971) (Three-Judge District Court) (whether or not an action for judicial review can be brought against the President, "certainly such actions can be brought against the official who exercises functions vested by Congress in the President and delegated by the President to him"). See also *Ralpho v. Bell*, 569 F.2d 607, 616–617 (C.A.D.C.1977).

The deposition testimony of Christian R. Holmes, Director of the Cuban-Haitian Task Force between August 1 and November 4, 1980, makes it abundantly clear that he and the Task Force were not "involved in the development of alternate sites, or, for that matter, really in any sort of intensive review." Transcript of Holmes deposition at 23; and see *Id.* at 21, 25, 26, 28. Nor did Mr. Holmes direct other agencies to survey alternate sites. *Id.* at 27. He did not even know what sort of surveys were made of alternate sites, how many peopel were involved in making such surveys, or what kind of criteria were used to evaluate possible alternate sites. *Id.* at 34. Indeed, he had "no idea what sort of analysis was made" of possible alternate sites; see also *Id.* at 36, 39, 40. Mr. Holmes summarized his testimony as follows: "The only option I know of and the only option I focused on was Allen." *Id.* at 43. Dr. Eidenberg, who allegedly directed that some survey be made of alternate sites, testified that he directed no particular consideration of environmental factors—i. e., of the effects of refugee relocation on the rivers and streams around the sites selected or of the capacity of the surrounding areas to absorb solid waste generated by such facilities. Transcript of Eidenberg deposition at 35–36.

■ In these circumstances, it is clear that there were violations of NEPA in the selection of Fort Allen. The record demonstrates that there was no careful consideration of environmental factors. Certainly, there was no attempt to study, develop, and describe alternative locations.

Defendants assert that the President, and presumably those to whom he delegates, is not subject to NEPA because he is not an "agency" of the Federal Government. This argument overlooks the delegation previously discussed; and the language of Section 102(1) of NEPA which directs that "the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies" in NEPA, and with no other restrictions than that this be done "to the fullest extent possible." See *Calvert Cliffs' Coord. Com. v. A. E. Com'n.*, supra, at 1114.

■ The only authority cited by Defendants in support of this proposition is a regulation issued by the Council on Environmental Quality ("CEQ") and codified at 40 C.F.R. § 1508.12. That regulation is without statutory authorization [17] and contrary to prevailing case law.

■ NEPA applies, without limitation, to actions taken by "all agencies of the Federal Government." Since there is no definition of the term "agency" in NEPA, the courts have looked to the Administrative Procedures Act for guidance as to the scope of that term. See *United States v. Kaiser Aetna*, 408 F.Supp. 42, 55 n. 36 (D.Hawaii 1976) (courts are not agencies for purposes of NEPA by analogy to 5 U.S.C. § 551(1)(B), the APA definition) rev'd on other grounds, 584 F.2d 378 (C.A.9, 1978), reinstated, 444 U.S. 164, 99 S.Ct. 1211, 59 L.Ed.2d 453 (1979). See also *Ralpho v. Bell*, supra. Although the status of the Presidency under the APA has not been definitively settled,

> . . . "leading students of the APA, whose analyses are often cited by the Supreme Court, and who on some matters are in conflict with each other, seem to be in agreement that the term 'agency' in the APA includes the President—a conclusion fortified by the care taken to make express exclusion of 'Congress' and 'the courts.'" *Amalgamated Meat Cutters and Butcher Workers v. Connally*, supra, at 761.

---

17. Indeed, CEQ has no statutory authority even to issue regulations, *Greene County Planning Board v. FPC*, 455 F.2d 412, 421 (C.A.2, 1972); see 42 U.S.C. § 4344, and its guidelines do not have the force of law, *Hiram Clarke Civic Club Inc. v. Lynn*, 476 F.2d 421 (C.A.5, 1973).

**1058**

And see *Soucie v. David*, 448 F.2d 1067, 1073, n. 17 (C.A.D.C.1971). In these circumstances, the CEQ's unauthorized regulation purporting to exclude the President from NEPA is *ultra vires* and void.

The deposition testimony of Dr. Eidenberg makes it abundantly clear that his actions are of little help in our search for someone who studied, developed and described appropriate alternatives to the Fort Allen location. In the first place, Dr. Eidenberg did not direct any consideration of environmental factors in selecting a relocation site. That is, there was no evaluation of the "effects on the rivers and streams around these areas" of establishing a refugee camp. Nor was there any assessment of the "capacity of the surrounding area[s] to absorb the solid waste that might be generated by these facilities." Transcript of Eidenberg deposition at 35–36. Nor do the voluminous documents which have been produced in this litigation reveal any pre-decision consideration of the possibility of a malaria outbreak in Puerto Rico as a result of housing Haitian refugees at Fort Allen. Further, the Eidenberg deposition testimony makes clear that he had only the most passing knowledge of alternatives to that site. He never saw any list of alternative sites. Id. at 31–32. Though he asserted directed G.S.A. to look at alternative sites, that direction was apparently limited to only one site—Richmond Naval Station in Dade County, Florida. Id. at 32. There may have been one other site investigated by G.S.A. in Maryland somewhat earlier in time, but Dr. Eidenberg was unable to recall the details. *Id.* at 33. He recalled having asked DOD to look at "several" sites, but named only Fort Allen, Ramey Air Force Base, an Air Force Base in South Florida, and facilities in Arizona and Montana. *Id.* at 33–34. He admitted that "we became narrowly focused on South Florida and Puerto Rico very quickly." *Id.* at 35.

Clearly this record does not reveal the sort of searching evaluation of environmental considerations that is mandated by Section 101(b) of NEPA. Nor did Dr. Eidenberg's sketchy recollection of fragmentary analyses of a few isolated facilities constitute the searching study, development, and description of alternative sites required by Section 102(2) of NEPA.

### 4. *The Coastal Zone Management Act*

The Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–1456, has as one of its purposes the encouragement of states to "exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of land and water resources of the coastal zone...." Id. Sec. 1452(b). Consequently, once a state has established such a management program and has had it approved by the Secretary of Commerce, see id. Sec. 1455, "[e]ach federal agency conducting or supporting activities *directly affecting the coastal zone* shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs," id. Sec. 1456 (emphasis added).

On November 18, 1980, Defendants apparently addressed a letter to Fred V. Soltero Harrington, Secretary of the Puerto Rico Department of Natural Resources. The letter purports "to remove this issue (concerning the Coastal Zone Management Act ("CZMA") from the case" by asserting "that the [present] operations at Fort Allen are consistent with the Puerto Rican Coastal Zone Management Plan and will have no adverse effect on the coastal zone in the Fort Allen area."

The filing of a statement asserting that the federal activity is consistent with the state's management program is not an end in itself. A principal purpose of requiring such a statement from the federal agency is to apprise the state of the federal activity to be conducted, thus allowing *the state* to participate in determining whether the activity is consistent to the "maximum extent practicable" with the objectives and policies stated in the management program. It is the general intent of CZMA and the regulations that any disagreements as to the consistency of the activity will be resolved

through discussions—i. e., mutual give-and-take. To enable the state to make a determination regarding the activity and to facilitate inter-governmental discussions, it is necessary that the state be given enough information to reach an informed decision.

The regulations spell out in some detail what types of information a consistency statement should contain. In the first place, the determination *must* include a "detailed description of the (proposed) activity, its associated facilities, and their coastal zone effects, and *comprehensive data* and *information* sufficient to support the federal agency's consistency statement." 15 C.F.R. Sec. 930.39(a) (emphasis added). The amount of detail required as to any of these categories is to be commensurate with the expected effects on the coastal zone. Id. Additionally, there must be an evaluation of the predicted effect on the coastal zone and a full analysis of its consistency with the state plan.

 The letter submitted by Defendants is totally inadequate. It does not even mention—much less describe—the refugee operation contemplated at Fort Allen. Certainly Defendants have not evaluated the proposed activities in light of the objectives and policies of the management program. In short, it is impossible for the Puerto Rican agency to reach an informed decision regarding the consistency of the proposed activities at Fort Allen with the Puerto Rican plan.

In any event, even if the statement were adequate under the regulations, the federal Defendants would not be free to undertake the proposed activity at Fort Allen until 90 days after its filing. The filing of a consistency statement triggers a number of other procedural requirements. To permit the state adequately to evaluate the statement, the state agency is given 45 days in which to decide whether it agrees or disagrees with the federal agency determination. 15 C.F.R. Sec. 930.41(a). In addition, the state agency is entitled to one 15-day extension to review the matter. Id. Sec. 930.41(b). In any event, the regulations state that "[f]inal federal agency action *may not be*

*taken sooner than 90 days from the issuance of the consistency determination* to the State agency. . . ." Id. Sec. 930.41(c) (emphasis added). The final 30 days of the 90-day period (assuming the state takes the full 60 days to reach a determination) are to be used to resolve any disagreement the state and federal agency might have. 44 Fed.Reg. 37149 comment to Sec. 930.41 (1979). In addition, if the federal agency and the state agency are unable to reach agreement by the end of the 90-day period, the federal agency is "encouraged to suspend implementation of the activity beyond the 90-day period pending resolution of the disagreement." 44 Fed.Reg. 37149 comment to Sec. 930.41 (1979).

Thus, the mere filing of a purported consistency statement in this case does not free the federal Defendants to undertake the proposed activity at Fort Allen. Even if the purported statement were adequate, they are required to wait *at least* 90 days after its filing before transferring refugees to Fort Allen. Certainly, therefore, the November 18 document does not "remove this issue from the case."

Defendants contend that the CZMA is inapplicable to the activities at Fort Allen. For this proposition they rely upon our decision in *Barceló v. Brown*, 478 F.Supp. 646 (D.P.R.1979), and in the definition of the term "coastal zone" contained in the CZMA, 16 U.S.C. § 1453(1).

It would seem that their filing of the November 18 "consistency statement" is demonstrative of some degree of inconsistency as well as lack of faith with that position.

Be that as it may, however, Defendants' reliance on that case and that provision of the CZMA are not well placed. The pertinent exclusion in 16 U.S.C. § 1453(1) reads as follows:

"... Excluded from the coastal zone are lands the use of which is by law *subject solely to the discretion of or which is held in trust* by the Federal Government, its officers or agents." (Emphasis supplied).

The legislative history of this provision gives us some insight into its meaning (See Senate Report No. 92–753, 1972 U.S.Code Cong. and Admin. News, pp. 4776, 4783):

"... All federal agencies conducting or supporting activities in the coastal zone are required to administer their programs *consistent with approved state management programs.* However, such requirements do not convey, release or diminish any rights received or possessed by the Federal Government under the Submerged Lands Act or the Outer Continental Shelf Lands Act or extend state authority to land subject solely to the discretion of the Federal Government such as national parks, forests and wildlife refuges, Indian reservations and *defense establishments ...* " (Emphasis added).

In *Barceló v. Brown,* supra, Defendants there clearly placed the Federal lands in Vieques within this definition. In the present case, the evidence is to the effect that Fort Allen was *de facto* if not *de jure* closed down as a defense facility. The presently intended purpose of Fort Allen hardly classifies it as a "defense establishment."

Furthermore, Defendants blithely overlook that this Court in *Barceló v. Brown,* supra, specifically left open and *did not decide* the issue of applicability of the CZMA. See *Barceló v. Brown,* at 478 F.Supp. 681.

The legislative history previously alluded to, as well as other references, supports Plaintiffs' contention to the effect that the exclusion of the "federal lands" (as indicated) from the term "coastal zone" applies only to the land itself and not to the *effects* on the surrounding non-federal coastal zone that may be caused by federal activities conducted on federal lands.

The Senate Report on the Coastal Zone Management Act amendments of 1976 states:

"[The federal consistency section] ... assures that once State coastal zone management programs are approved and a rational management system for protecting, preserving and developing the State's coastal zone is in place (approved), and instrumentalities will not violate such system but will instead, conduct themselves in a manner consistent with the States' approved management program. This includes conducting or supporting activities *in or out of the coastal zone which affect that area."* S.Rep.No. 94–277, reprinted at [1976] U.S.Code Cong. & Ad.News 1768, 1804 (emphasis added).

In promulgating regulations pursuant to CZMA, the Commerce Department clearly stated that

... "the exclusion of federal lands does not remove federal agencies from the obligation of complying with the consistency provisions of section 307 of the Act when federal actions on these excluded lands have spillover impacts that significantly affect coastal zone areas." 15 C.F.R. Sec. 923.33(C)(1).

The application of the CZMA to the Fort Allen situation is triggered by the fact that Puerto Rico has an approved coastal zone management program and that the federal activities taking place at Fort Allen will have a direct effect on the designated coastal zone. Pursuant to the regulations promulgated under CZMA, 15 C.F.R. § 930.-35(a), Puerto Rico has set out certain activities which in its opinion will presumptively affect the coastal zone. Among those activities are "waste discharge in the coastal watershed" and "waste discharge in the coastal waters." The activities at Fort Allen will result in such discharges. Therefore, even if Defendants ultimately show that the manner in which the activities will be carried out is not inconsistent with Puerto Rico's management plan, they would not be relieved from observing the procedural requirements promulgated pursuant to CZMA. As shown below, these regulations require the filing of a consistency statement at least 90 days prior to undertaking the proposed activity. See 15 C.F.R. § 930.-41(a).

In the instant case, however, not only does the evidence show a direct effect on the coastal zone, but there is ample evi-

dence that that impact will be adverse. The inevitable result of overloading the capacity of the waste-water treatment facility will be the release of partially treated sewage into the coastal zone. In addition, the thousands of pounds of solid waste that will be generated by the refugees at Fort Allen, will be dumped into an already severely overloaded landfill that has difficulties with flooding and has been known to permit solid waste to be carried downstream through the coastal zone. Therefore, the activities at Fort Allen will clearly be inconsistent with Puerto Rico's management plan.

These activities are in violation of the CZMA.

### The National Historic Preservation Act

Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, requires that the heads of all federal agencies having jurisdiction over federal undertakings take into account "the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register (of Historic Places)" *prior to* the expenditure of any federal funds on the undertaking. A similar requirement is set forth in Executive Order 11593, "Protection and Enhancement of the Cultural Environment," 36 Fed.Reg. 8921. Regulations issued by the Advisory Council on Historic Preservation, pursuant to the NHPA and Executive Order 11593, require that each federal agency "identify or cause to be identified any national register or eligible property that is located within the area of the undertaking." 36 C.F.R. § 800.4(a).

■■■ Defendants failed to comply with the requirements enumerated above *before* commencing construction of Fort Allen. Furthermore, the archeological survey report prepared by Linda Sickler Robinson on October 13, 1980, *after* the construction commenced, does not exonerate Defendants' noncompliance with NHPA. Additionally, Ms. Robinson's report is insufficient to satisfy the requirements of NHPA in that, contrary to regulations issued by the Advisory Council on Historical Preser-

vation, she did not consult with the State Historic Preservation Officer concerning historical and cultural properties known to be within the area of Fort Allen prior to undertaking her survey, nor did she conduct a literature search to determine "what historic and cultural properties are known to be within the area of the undertaking's potential environmental impact" prior to beginning her work. 36 C.F.R. §§ 800.4, 800.4(a)(1). These requirements go to the heart of NHPA—for without compliance, an archeological survey may fail to uncover existing cultural resources for the simple reason that the archeologist may not know what he/she is looking for.

### Allegations of Public Nuisance

■■■ A public nuisance may arise from "an unlimited variety of fact situations." *St. Joseph Lead Co. v. Prather*, 238 F.2d 301, 305 (C.A.8, 1956). "The broad indefinite measuring rule is that a person must so control and use his property as to prevent injury to others in the rightful use of themselves and their property." *Id.* at 305–306. The transfer of refugees to Fort Allen will give rise to an enjoinable public nuisance.

In 1972, the Supreme Court held that a state possesses a federal common law right to enjoin pollution of interstate waterways as a public nuisance. *Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); see also *United States v. Reserve Mining Co.*, 380 F.Supp. 11, 16 (D.Minn.1974); *United States ex rel. Scott v. United States Steel Corp.*, 356 F.Supp. 556, 558 (N.D.Ill.1973); *Reserve Mining Co. v. EPA*, 514 F.2d 492, 520 (C.A.8, 1975), modified sub nom. *Reserve Mining Co. v. Lord*, 529 F.2d 181 (C.A.8, 1976).

■■■ Recent holdings of the United States Court of Appeals for the Seventh Circuit have made clear that the 1972 and 1977 amendments to the Federal Water Pollution Control Act do not preempt the federal common law of nuisance, *Illinois v. Milwaukee*, 599 F.2d 151, 162–63 (C.A.7,

1062

1979), cert. granted, 444 U.S. 961, 100 S.Ct. 445, 62 L.Ed.2d 373 (1980), and that a nuisance claim may be asserted under federal common law with respect to pollution arising in and affecting only a single state, *People of State of Illinois v. Outboard Marine Corp.*, 619 F.2d 623, 629 (C.A.7, 1980).

■■■ The elements of a claim based on the federal common law of nuisance

... "are simply that the defendant is carrying on an activity that is causing an injury or significant threat of injury to some cognizable interest of the plaintiff." *Illinois v. Milwaukee*, supra, 599 F.2d at 165.

The record makes clear that the housing of the intended number of refugees and support personnel at Fort Allen will inevitably result in the sort of public nuisance for which a cause of action has been held to exist under federal common law. Most importantly, the processing of wastewater generated by that number of persons through the existing wastewater plant at Fort Allen will inevitably exceed the capacity of that plant, resulting in the discharge of insufficiently treated sewage into drainage ditches leading from Fort Allen and ultimately into the Caribbean Sea, an interstate body of water. Indeed, this court has held—and the record shows—that the existing wastewater treatment plant at Fort Allen is sufficient to handle the wastewater generated by no more than approximately 1,500 persons. Thus, the expected influx of refugees to Fort Allen will greatly exceed the plant's capacity and result in the release of untreated or insufficiently treated sewage.

The contemplated refugee operation will also generate thousands of pounds per day of solid waste, which will be dumped at Juana Diaz. This landfill is already seriously overloaded and has difficulties with flooding. The contemplated disposition of solid waste will therefore result in additional pollution of the coastal streams of Puerto Rico and ultimately of the Caribbean Sea.

Defendants have asserted sovereign immunity as a defense to Plaintiffs' nuisance claims. In this case, however, the defense of sovereign immunity is waived by Section 702 of the APA, 5 U.S.C. § 702.

Effective October 21, 1976, Congress amended Section 702 of the APA for the express purpose of "remov[ing] the defense of sovereign immunity as a bar to judicial review of federal administrative action otherwise subject to judicial review." H.R.No. 1656, 94th Cong.2d Sess. 1, reprinted at (1976) U.S.Code Cong. & Ad.News 6121, 6121. In proposing this amendment, the House Committee took note of the fact that judicial review of actions of the older executive departments—including the Departments of State and Defense—was available only through "nonstatutory" [18] suits under 28 U.S.C. § 1331. *Id.* at 5, reprinted at (1976) U.S.Code Cong. & Ad.News 6121, 6125. Thus, the legislative history indicates that Section 702, as amended, was intended as a waiver of sovereign immunity for "nonstatutory" suits brought under 28 U.S.C. § 1331. As a result of the 1976 amendments, Section 702 states in pertinent part:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employees thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702.

Additional light is shed on the meaning of the waiver provision by the Supreme Court's subsequent decision in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51

---

**18.** "Nonstatutory" suits are those not brought under statutes specifically providing for review of that agency's action. H.R.No.1656, 94th Cong.2d Sess. 5, reprinted at (1976) U.S.Code Cong. & Ad.News 6121, 6125.

L.Ed.2d 192 (1977). There the Court was faced with the question whether Section 702 constitutes an independent grant of subject matter jurisdiction, as several courts of appeals had held. Noting that

"The argument in favor of APA jurisdiction rests exclusively on the broad policy consideration that, given the shortcomings of federal mandamus jurisdiction, such a construction is warranted by the rational policy of affording judicial review of actions of federal officials acting pursuant to federal law ....", id. at 106 ...

the Court rejected APA as an independent grant of jurisdiction on the ground that the 1976 amendments had made 28 U.S.C. § 1331 available to fulfill the purpose for which APA jurisdiction was sought. Focusing specifically on the elimination of the $10,000 jurisdictional amount, but obviously speaking broadly about the reach of Section 1331, the Court opined:

"The obvious effect of this modification, subject only to preclusion-of-review statutes created or reclaimed by Congress, is to confer jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate. We conclude that this amendment now largely undercuts the rationale for interpreting the APA as an independent jurisdictional provision." Id. at 105, 97 S.Ct. at 984; and see *TM Systems v. United States*, 473 F.Supp. 481, 486 (D.Conn. 1979).

Obviously Section 1331 could only serve the purpose envisioned for it by the Supreme Court if the 1976 amendments constituted a waiver of sovereign immunity respecting suits brought under that Section. So recognizing, the Third Circuit expressly held in *Jaffee v. United States*, 592 F.2d 712, 719 (C.A.3, 1979), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), that Congress enacted the 1976 amendments precisely to waive the bar of sovereign immunity for equitable actions

brought under 28 U.S.C. § 1331. See also *Sheehan v. Army & Air Force Exchange Service*, 619 F.2d 1132, 1139 (C.A.5, 1980); *Collyard v. Washington Capitals*, 477 F.Supp. 1247, 1252–1252 (D.Minn.1978) ("the legislative history makes clear that Congress intended to waive sovereign immunity as a technical defense to suits for injunctive and declaratory relief").

▮ Puerto Rico's public nuisance claim in this case falls squarely within the waiver of Section 702. Puerto Rico "stands to suffer legal wrong because of agency action", and jurisdiction is properly grounded on 28 U.S.C. § 1331, *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972) ("§ 1331 jurisdiction will support claims founded upon federal common law"). Compare *Eric v. HUD*, 464 F.Supp. 44 (D.Alaska 1978), where Plaintiff alleged a breach of the federal common law trust responsibility owed to Indians, Id. at 45. The Court held that jurisdiction was proper under 28 U.S.C. § 1331, Id at 47, and that under Section 702, the district court was not barred by sovereign immunity from deciding whether the defendant had violated its trust duty or had acted in an arbitrary and capricious manner, Id. at 48.

The Court of Appeals for this Circuit has not addressed this aspect of the Section 702 proviso.[19]

Plaintiffs have thus shown that the contemplated refugee operations at Fort Allen would necessarily constitute a public nuisance in several respects.

*Other Miscellaneous Claims*

In their Sixth and Seventh Claims for relief, Individual Plaintiffs allege that Defendants' exercise of control and restriction of the land in Fort Allen is contrary to the United Nations Charter and the Federal Relations Act of 1950, 48 U.S.C. Section 749.

▮ The United States still owns Fort Allen and, although it can no longer be considered a "defense establishment", it has not yet been ceded to Puerto Rico. Moreover, by notice dated July 27, 1945, the

---

**19.** *Massachusetts v. V. A.*, 541 Fed.2d 119, 123 (C.A.1, 1976), relied on by defendants, was handed down on August 26, 1976—*prior* to the amendment to 5 U.S.C. § 702 discussed in the text. Accordingly, that holding is inapposite.

Secretary of War accepted exclusive jurisdiction over Fort Allen, and the Governor of Puerto Rico acknowledged that acceptance several days later. On July 1, 1963, the Department of the Army transferred jurisdiction over Fort Allen to the Department of the Navy, which that Department has retained to date. Accordingly, there can be no violation of the Federal Relations Act, 48 U.S.C. Section 749.

■ Secondly, Individual Plaintiffs have no standing to raise any claims regarding alleged violation of the United Nations Charter. That Charter, like other international obligations which are not self-executing, does not confer on individual citizens rights that are judicially enforceable in American domestic courts. See *Diggs v. Richardson*, 555 F.2d 848, 850–51 (D.C.Cir. 1976); *People of Saipan v. United States Department of the Interior*, 502 F.2d 90, 101 (C.A.9, 1974); Restatement (Second) of Foreign Relations, Section 154 (1955). Therefore, Individual Plaintiffs' Sixth and Seventh Claims should be dismissed.

*The Remedy*

The Court has found that Defendants' activities at Fort Allen in constructing the refugee camp, and their proposed transfer thereto, are in violation of:

a. Section 6001(2) of the Solid Waste Disposal Act, 42 U.S.C. § 6961(2),

b. Section 102(1) and (2)(E) of the National Environmental Policy Act, 42 U.S.C. § 4332(1) and (2)(E).

c. Section 307 of the Coastal Zone Management Act, 16 U.S.C. § 1456.

d. Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f.

e. The Federal common law of nuisance.

These violations of law, on the one hand, entail the construction of a refugee camp which is *de facto* there, and on the other hand, concern additional violations of law which will occur if the refugee transfer takes place. Both violations cannot be treated the same.

"Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 94 L.Ed. 1083 (1955).

The circumstances of this case do not stand on the same footing as those in *Barceló v. Brown*, supra, wherein the naval training activities conducted in the Island of Vieques by the United States Navy were found to be "essential to the defense of the Nation" and as to which the Court found to be no suitable alternatives for the conduct of said activities.

Considering the above, it is hereby OR-DERED that:

1. Defendants, their agents, employees, and all persons acting in concert therewith, be and they hereby are, permanently enjoined from transferring to Fort Allen, Juana Diaz, Puerto Rico, any and all persons referred to as Cuban-Haitian refugees in the body of this Decision and Order, until such time as said Defendants comply with the aforementioned provisions of law.

2. It is further ORDERED that a hearing is hereby scheduled before this Court on February 13, 1981 at 9:00 A.M. for the purpose of considering what action if any, shall be taken by the Court in connection with the illegal construction of refugee facilities at Fort Allen, Juana Diaz, Puerto Rico.

IT IS SO ORDERED.